IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CHARLOTTE INGRAHAM,
as Personal Representative for the
Wrongful Death Estate of
PARRISH DENISON, deceased,

Plaintiff, vs.                                        15-cv-00308-SCY-KBM

CITY OF ALBUQUERQUE et al,

Defendants.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' FIRST
MOTION FOR SUMMARY JUDGMENT BASED ON QUALIFIED
IMMUNITY AND OTHER GROUNDS [DOC. 15]**

Plaintiff, by and through his attorneys, Frances Carpenter and Hans Erickson, hereby submits

this as his *Response* to *Defendants Anthony Sedler[1] and Francisco Aragon's Motion for Summary Judgment Based*

*upon Qualified Immunity and Other Grounds* ("*Motion*") [Doc. 15] and states as follows.

*I. PLAINITFF'S SUPPLEMENTAL FACTS*

Pursuant to Local Rule 56.1(b), Plaintiff supplements Defendants' *Statement of Undisputed*

*Material Facts* with the following *Supplemental Undisputed Material Facts*.[2]

A.       Frick responded to a priority 2[3] call advising that a female was attempting to sell a banjo

which the employees of Music-Go-Round music store believed was stolen. Plaintiff's Exhibit 1,

Detailed History of Police Event #P130641096, at 18:10:29.  Dispatch also advised that there was

a white Infinity SUV parked backwards in a space and that they didn't know if it was related or not.

Plaintiff's Exhibit 1, at 18:16:50.  Dispatch advised further that the employee of Music-Go-Round

---

[1] Officer Sedler's name is mistakenly spelled "Seddler" in the caption of the Amended Complaint, however is spelled
correctly in the body of the Amended Complaint, and has been spelled correctly in all subsequent pleadings.
[2] Additional lettered supplemental undisputed material facts are incorporated in Plaintiff's *Response to Defendant's
Undisputed Material Facts*.
[3] APD prioritizes calls on three main levels. A priority 1 call is a felony that is in progress or there is an immediate
threat to life or property. A priority 2 call is where there is no immediate threat to life of property. Misdemeanor
crimes in progress are priority 2 calls.

1

music store wanted officers to make contact with two males parked in a truck in front of a jewelry store (known to be Beauchamp jewelry store) and that these individuals may be the same individuals who brought in amplifiers and bass the day before. Plaintiff's Exhibit 1, at 18:28:07-18:32:47.

B.      The distance between Beauchamp jewelry store and Music-Go-Round music store is over 380 feet, over the length of a football field. As such, it is doubtful that the employee of Merry-Go-Round could see from inside the store all the way across Menaul and into the truck parked at Beauchamp Jewelry store to accurately identify anyone. See Google Map attached hereto as Exhibit 2.

C.      SWAT officers were informed by phone or text message at approximately 7:00PM that there was a SWAT activation and to report to the area of Menaul and Louisiana to search for an armed suspect. *See* Plaintiff's Exhibit 3, Transcript of Anthony Sedler's Statement to Police, [6:3-8] and Plaintiff's Exhibit 4, Transcript of Anthony Aragon's Statement to Police, [5:17-6:2].

D.      Officer Sedler arrived in the area of Menaul and Louisiana at approximately 7:15PM, and was in the position from which he ultimately shot Denison beginning between 7:30 and 7:45PM. *See* Plaintiff's Exhibit 3, [28:18-23].

E.      By 6:43PM, police officers had established a perimeter around Denison and blocked traffic from entering that area. Plaintiff's Exhibit 1, at 18:43:14.

F.      By 6:49PM, the Sheraton hotel was locked down. Plaintiff's Exhibit 1 at 18:49:38.

G.      By 6:51PM, the Chili's restaurant was "locked down." Plaintiff's Exhibit 1 at 18:51:45.

H.      By 6:55PM, police officers had begun making announcements to citizens. Plaintiff's Exhibit 1 at 18:55:44.

I.      By 7:29PM, the Valero gas station was locked down. Plaintiff's Exhibit 1 at 19:29:39.

**J.**     Between 7:35 and 8:00PM, Officers contacted and attempted contact with additional area business to inform them of the situation and request that they lock their doors. Plaintiff's Exhibit 1 at 19:35:31 – 19:57:16

**K.**     Chili's restaurant employee had to unlock the door for Defendant Aragon to allow him and Officer Ronald Tosta to enter the building and gain access to the roof. *See* Plaintiff's Exhibit 4, at 26:14 - 27:21.

**L.**     There is no access to the Chili's restaurant from the North (Alley) or East (Chama) sides of the building. *See* Plaintiff's Exhibit 5, Affidavit of David Dawson, Manager of Chili's.

**M.**     The door on the East side of the building (West side of Chama) and in front of which Denison was shot by Officer Sedler does not provide access to the Chili's restaurant. *See* Plaintiff's Exhibit 6, Affidavit of Rob Carson, Owner of Oak Tree Café.

**N.**     Officer Sedler never gave a verbal command to stop or a verbal warning that he was going to shoot before shooting Denison. *See* Plaintiff's Exhibit 3, 51:24 – 52:1.

**O.**     No officer gave Denison a command to stop or any other order between the time that Denison left his hiding place and the time that Officer Aragon fired his first and second shots at Denison. Exhibit 4, 56:10-17.

**P.**     Denison had started moving out of the bush and from behind the front of the vehicle where he was hiding when Officer Aragon fired his first shot. Exhibit 4, 12:17-22. See Diagram attached hereto as Exhibit 13.

**Q.**     When Officer Aragon first shot Denison, Officer Sedler could not see Denison and Denison could not have seen Officer Sedler because there was a building and a vehicle separating the two. Plaintiff's Exhibit 3, 31:9 – 32:2.

**R.**     Officer Aragon was never in fear of his own safety. Defendant Aragon stated to a police investigator after the incident, "I don't believe I was in any immediate danger, but I feared for the lives of the people that were in the area. I do believe that he could have caused them great bodily harm or death." Exhibit 4, 14:8-11.

**S.**     The SWAT officers approaching Denison's hiding place on Menaul from the east were in or around an armored vehicle, known as a bearcat, capable of withstanding rounds from a high-powered rifle. *See* Plaintiff's Exhibit 7, Information from LencoArmor Website about Bearcat http://www.lencoarmor.com/law-enforcement/.

**T.**     Officer Sedler was providing protection coverage for other officers who were armed with a range of weapons including rifles, handguns, beanbag shotguns, tasers, and a police dog. Exhibit 3, 26:20 – 27:11.

**U.**     After getting up from his hiding spot, Denison ran north on Chama towards Officer Sedler and other SWAT officers but <u>only after</u> Officer Aragon had fired his first of two shots at Denison. *See* Defendant's Exhibit B-1 to their Motion for Summary Judgment (helicopter video) at 20:11:19-21.

**V.**      Officers' positions around Denison's hiding place meant that he would immediately encounter officers in any direction that he moved. Defendant Aragon stated to a police investigator in explaining why he shot Denison when he immediately got up from his hiding spot[4], "[a]t that moment, I feel that if he moves in any direction, he's going to put the other offices in danger and could possibly harm them or kill them." *See* Plaintiff's Exhibit 4, 38:2-5.

---

[4] This statement by Defendant Aragon contradicts Defendants' unsupported allegation that, "[o]nce tactical officers attempted to approach Mr. Denison using the Bearcat armored vehicle for cover in order to contact him and initiate a dialogue…"

**W.**     Denison never pointed his gun at an officer between the time he left his hiding place and the time he was shot by Officer Sedler.  Defendant's Exhibit B-1 at 20:11:18-25.

**X.**     Officers Sedler and Aragon shot Denison at approximately 8:11 PM. Defendants' Exhibit B-1 at 8:11:25-27.

**Y.**     After first being shot by Officer Aragon, Denison never made any threatening movement toward any person.  Defendant's Exhibit B-1 at 20:11:19-25.

**Z.**     After getting up from his hiding spot Denison never threatened any officer or any person. Defendant's Exhibit B-1 at 20:11:18-19.

**AA.**     Defendant Sedler fired three rounds at Denison.  *See* Defendants' Exhibit D, Affidavit of Defendant Sedler, 6:30.

**BB.**     Defendant Aragon fired two rounds at Denison. *See* Defendants' Exhibit C, Affidavit of Defendant Aragon, 4:23.

**CC.**     Denison was shot five times, once in the left chest, once in the left abdomen, once in the right thigh, once in the left thigh, and once in the right lower leg. *See* Plaintiff's Exhibit 8, Report by the Office of the Medical Investigator, 2-4.

**DD.**     The medical examiner recovered three projectiles from Denison's body with weights of between fifty and fifty-six grains each. *See* Plaintiff's Exhibit 8, 2-4.

**EE.**     Defendant Sedler shot Denison in the upper left chest, with that projectile traveling through Denison's lung and pericardium, and lodging between his third and fourths ribs in his back.  *See* Plaintiff's Exhibit 8, 2.

**FF.**     Defendant Sedler shot Denison in the upper left abdomen, with that projectile traveling through Denison's abdomen and lodging in the costal cartilage of his eighth rib.  *See* Plaintiff's Exhibit 8, 2-3.

**GG.** Defendant Sedler shot Denison in the right thigh, with that projectile lodging in Denison's right femur. *See* Plaintiff's Exhibit 8, 3-4.

**HH.** Defendant Aragon shot Denison in the left thigh, with that projectile traveling from the back to the front of Denison's thigh, upwards and to the left, and exiting Denison's body. *See* Plaintiff's Exhibit 8, 3.

**II.** Defendant Aragon shot Denison in the right lower leg, with that projectile traveling from the front to the back of Denison's leg, upward and slightly right to left, and exiting Denison's body. *See* Plaintiff's Exhibit 8, 2-3.

**JJ.** The weights of the projectiles recovered from Denison's body are consistent with rounds used in Defendant Sedler's weapon, but inconsistent with the rounds used on Defendant Aragon's weapon. As such, three shots fired by Officer Sedler struck Denison and remained in his body and the other two gunshot wounds to Denison's body were fired by Aragon's high-powered sniper rifle. *See* Plaintiff's Exhibit 9, Criminalistics Major Crime Scene Report and Exhibit 13.

**KK.** Officer Perdue who was positioned on the southeast side of Menaul and had a sniper rifle facing north towards Chama where Denison was hiding. He was given permission to independently deploy and cover the police officers involved. As Officer Perdue was positioned laying down and grasping his rifle, he caused the rifle to discharge. He sent a high powered round near where Dension was hiding. The bullet crossed Menaul, the parking lot where Denison was hiding and into a building. See Defendants' Exhibit D ¶ 15 and Sworn Statement of Officer Purdue attached hereto as Plaintiff's Exhibit 10 and Diagram as Plaintiff's Exhibit 13.

**LL.** It was always the Officers plan to stop any movement made by Denison. So no matter where he went, the moment he got up from his hiding spot he was going to get shot by Officers. They were

actively trying to get him to move from his location because the helicopter was running low on fuel. See transcript of CAD 62:6-8, 63:10-14, 64:5-15, 68:14-16 attached herewith as Exhibit 14.

## *II. RESPONSE TO DEFENDANT'S UNDISPUTED MATERIAL FACTS*

1.     Plaintiff disputes Defendants' *Undisputed Material Facts* ("UMF") UMF No. 1 as the record shows that the call was a priority 2 call.  Plaintiff Supplemental Fact A.

2.     Plaintiff disputes Defendants' *Undisputed Material Facts* ("UMF") UMF No. 2 as the record shows that dispatch advised that the employee of Music-Go-Round music store wanted officers to make contact with two males parked in a truck in front of a jewelry store (known to be Beauchamp jewelry store) which is not located in the strip mall parking lot of Music-Go-Round but across the street (Menaul) and over 380 feet away. Plaintiff Supplemental Fact A and B.

3.     Plaintiff disputes UMF No. 3 as the record shows that Officer Frick called for additional officers <u>after</u> he had already engaged with the two males in the truck and one of the was westbound in the alley. Plaintiff's Exhibit 1 at 18:34:28.

4.     Regarding UMF Nos. 4-15 Plaintiffs do not have information at this time to either admit or deny however, Plaintiffs dispute that these facts are material to Defendant Officers' decision to use lethal force in violation of the 4th Amendment.

5.     Plaintiff disputes UMF No. 16 as Officer Tosta claims he did see Denison but he claims he never saw Denison with a gun.  See Plaintiff's Exhibit 11, APD Supplementary Offense Report at 20-21.

6.     Plaintiff disputes UMF No. 17-22 as Plaintiffs do not have information at this time to either admit or deny however, Plaintiffs dispute that these facts are material to Defendant Officers' decision to use lethal force in violation of the 4th Amendment.

7.     Plaintiff admits UMF Nos. 23.

8.      Plaintiff disputes UMF No. 24 on the grounds that it is not a material fact but rather a legal conclusion, and moreover cannot be presented in a form that would be admissible in evidence.

9.      Plaintiff admits UMF Nos. 23-30.

10.     Regarding UMF Nos. 31-37 Plaintiff does not have information at this time to either admit or deny however, Plaintiffs dispute that these facts are material to Defendant Officers' decision to use lethal force in violation of the 4th Amendment.

11.     Plaintiff disputes UMF No. 38 and 39 on the grounds that it is not supported by the materials cited, and that those materials in fact show the opposite to be true. See Plaintiff's Supplemental Facts E-M, P-V.  See also Plaintiff's Exhibit 1 at 19:32:18, "If subject runs north Chama will have subject contained."  Moreover, the materiality of this dispute is questionable under *Graham*, which counsels focus on the objective factors facing the police, not their subjective speculations.  If we allow law enforcement to deploy force merely because they predict someone may become aggressive the Fourth Amendment guarantee will have no meaning.  *Graham v. Connor*, 490 U.S. 386 (1989).

12.     Plaintiff admits UMF No. 40.

13.     Plaintiff disputes UMF No. 41 as the materiality of this dispute is questionable under *Graham*, which counsels focus on the objective factors facing the police, not their subjective speculations.  If we allow law enforcement to deploy force merely because they predict someone may become aggressive the Fourth Amendment guarantee will have no meaning.  *Graham v. Connor*, 490 U.S. 386 (1989).

14.     Plaintiff disputes UMF No. 42 as the video from Air One does not show a gun in Denison's hand.

15.     Plaintiff disputes UMF No. 43 as an "undisputed material facts" as it contains hearsay which is not sufficient evidence of a fact under Fed. R. Civ. Pro. 56. See *Sandoval v. Board of Regents*, 75

N.M. 261, 263, 403 P.2d 699, 700-01 (1965) (court eliminated hearsay statements from the affidavit).  See also Plaintiff's Supplemental Facts N and O.

16.     Plaintiff admits UMF No. 44 and 45.

17.     Plaintiff disputes UMF No. 46-47 See Plaintiff's Supplemental Facts E-M, P-V.  In addition to the fact that Sedler knew the facts contained in the aforementioned Plaintiff's supplemental facts, Sedler also knew that Denison did not point a gun at any officers.  Plaintiff's Supplemental Fact W, Y-Z.  Additionally, the Air One video attached and cited for support as Defendants' Exhibit B1 shows that Denison did not point a gun at anyone or any officers.

18.     Plaintiff disputes UMF Nos. 48-55 on the grounds that they not supported by the materials cited, and that those materials in fact show the opposite to be true.  See Plaintiff's Supplemental Facts E-M, P-V,W, Y-Z.

19.     Plaintiff disputes UMF Nos. 56-59 as immaterial.  The materiality of this dispute is questionable under *Graham*, which counsels focus on the objective factors facing the police, not their subjective speculations.  If we allow law enforcement to deploy force merely because they predict someone may become aggressive the Fourth Amendment guarantee will have no meaning. *Graham v. Connor*, 490 U.S. 386 (1989).

### III.   ARGUMENT

Plaintiff has alleged that Defendants violated his Fourth Amendment right to be free from unreasonable seizure and the use of excessive force.  Defendant requests this Court to grant him summary judgment on Plaintiff's claim based on the doctrine of qualified immunity.  Defendant is not entitled to summary judgment.  Pursuant to Fed. R. Civ. P. 56(a), a court may grant a motion for summary judgment only if "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Defendant's *Motion* fails to carry this burden because disputed material facts prevent the application of qualified immunity as well as

the fact that the record shows that Defendants' violated Denison's right to be free from illegal seizures and uses of deadly force.

### A. Summary Judgment Standard

Defendant bears the initial burden of showing an absence of evidence to support Plaintiff's case. *Connor v. Rodriguez*, 891 F.Supp.2d 1228, 1231 (D. N.M. 2011). If Defendant is successful, Plaintiff must "put forth specific facts showing that there is a genuine issue of material fact for trial. . . ." *Id.* This Court must consider all of the evidence in the light most favorable to the nonmoving party, and Plaintiff must offer enough evidence "that a reasonable jury could return a verdict in the" Plaintiff's favor. *Id.* "A motion for summary judgment may *only* be granted if there is *no* genuine issue as to any material fact…" *Frito-Lay, Inc. V. Retail Clerks Union*, 629 F.2d 653, 656 (10th Cir. Colo. 1980) (emphasis added, internal quotation marks omitted). The Tenth Circuit grants Rule 56 motions sparingly, noting the motion "is drastic and should be applied with caution" in order to afford litigants their right to trial. In order to properly protect the right to trial, the court "must consider factual inferences tending to show triable issues in a **light most favorable to the existence of such issues**." *Id.* (emphasis added).

In *Tolan v. Cotton*, 134 S.Ct. 1861 (2014), the court found that in considering motions for summary judgment it is improper to weigh more heavily evidence offered by the moving party[5]. The

---

[5] The Court in *Tolan* stated:

> "In articulating the factual context of the case, the Fifth Circuit failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inference are to be drawn in his favor.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). For that reason, we vacated its decision and remand the case for further proceedings consistent with this opinion."

The Court in *Tolan* went on to state:

> "But under either prong, the courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. See *Brosseau v. Haugen*, 543 U.S. 194, 195, n. 2 (2004) (per curiam); *Saucier*, *supra*, at 201; *Hope*, *supra*, at 733, n. 1. This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not

Court in *Tolan* went on to find that the lower court "did not credit directly contradictory evidence" and "[c]onsidered together, these facts lead to the inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion." "The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. This is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." *Id.*

### B. Qualified Immunity

In a section 1983 action, "individual defendants are entitled to qualified immunity unless it is demonstrated that their alleged conduct violated clearly established constitutional rights of which a reasonable person in their positions would have known." *Connor*, 891 F. Supp. 2d at 1231 (quoting *Brooks v. Gaenzie*, 614 F.3d 1213, 1219 (10th Cir. 2010). When a defendant pleads qualified immunity, the plaintiff must establish "(1) that the defendant's actions violated a federal constitutional or statutory right and (2) that the right violated was clearly established at the time of the defendant's actions." *Malik v. Arapahoe County Dep't of Social Servs.*, 191 F.3d 1306, 1314 (10th Cir. 1999) (quoting *Greene v. Barrett*, 174 F.3d 1136, 1142 (10th Cir. 1999)). In this circuit, "precise factual correlation between the then-existing law and the case at-hand is not required; thus, a then-existing case 'on all fours' with the case at hand is not essential." *Snell v. Tunnell*, 920 F.2d 673, 699 (10ᵗʰ Cir. 1990) (internal citations omitted). Governmental officials are "expected to

---

'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' *Anderson*, 477 U.S., at 249. Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.' Fed. Rule Civ. Proc. 56(a). In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.' *Adickes v. S.H. Kress & Co.*, 389 U.S. 144, 157 (1970)' see also *Anderson*, *supra* at 255."

relate established law to analogous factual settings and apply general, well developed legal principles." *Id.* (internal quotation marks and citations omitted).

Further, the standard for determination of whether a particular use of force by an officer violates the Fourth Amendment is virtually identical to the standard used in evaluating whether such officer is entitled to qualified immunity from suit. See *Quezada v. County of Bernalillo, 944 F.2d 710 (10th Circuit 1991)*, cited by *Diaz v. Salazar 924 F.Supp. 1088 (D.N.M. 1996)* (where the Tenth Circuit stated that "as a practical matter, the qualified immunity defense in excessive force cases is of limited value. While qualified immunity is a powerful defense in other contexts, in excessive force cases the substantive inquiry that decides whether the force exerted by police was so excessive that it violated the Fourth Amendment is the same inquiry that decides whether the qualified immunity defense is available to the government actor." *id at p.718.*[6]

Finally, it is axiomatic that the only facts that are material to the question of whether an officer's actions were objectively reasonable, are the facts that were known to the officer at the time of the event at issue. In other words, an officer cannot rely upon facts which, even if true,

---

[6] As the *Diaz* court further clarified:

"Police use of excessive force is an established constitutional violation. *Garner,* 471 U.S. at 7-8, 105 S.Ct. at 1699-1700 (1985). In an excessive force case, the fact finder determines if the police officer is liable by deciding if the force he used was objectively unreasonable. *Graham,* 490 U.S. at 399, 109 S.Ct. at 1873-74…Thus, given the common focus on reasonableness and the clearly-established unlawfulness of excessive force, the qualified immunity and excessive force analysis do not differ in any significant respect…. *Id.* at p. 1093. Accordingly, the only issue to be determined by this Court is whether, under the standards established by the Supreme Court and the 10th Circuit, Plaintiff has provided an evidentiary basis for facts which, if proven at trial, would establish that Defendant's use of lethal force against Plaintiff was excessive under the circumstances presented. This Court must consider, under the "totality of the circumstances", the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight." (*Graham v. Conner supra at p.396*). Evaluating the "totality of the circumstances" is inherently a factual inquiry, and is not a matter which can generally be resolved on summary judgment, except in the very few circumstances where both parties agree on all of the material facts giving rise to the officer's use of lethal force and that force, as a matter of law, would not be deemed excessive. *See e.g. Hastings v. Barnes et al,* 252 Fed. Appx. 197 (10th Cir. 2007), stating "because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application…its proper application requires careful attention to the facts and circumstances of each particular case….*id.* at p, 207); *Murphy v. Bitsoih, 320 F.Supp.2d 1174 (D.N.M. 2004) at p.1188* "the Fourth Amendment reasonableness standard is objective and heavily fact dependent.")

were not known to him or perceived by him prior to the use of force because those facts cannot have been a factor in the decision to use force.

C. **Count II—Excessive Use of Force - Comply or Die**

It is clearly established that an officer may not use deadly force when it is unnecessary, and when the suspect does not pose an immediate threat to the officer or to others. *See Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). An officer violates a clearly established right when he uses deadly force without probable cause that the suspect poses a serious threat of physical harm to the officer or to others. *Id.* Defendants therefore are not entitled to qualified immunity because there is a genuine dispute as to the material facts that would support Defendants' claim that they had probable cause to believe that Denison posed an immediate threat to others.

The Tenth Circuit has identified a number of non-exclusive factors to be considered in assessing the degree of threat presented by a suspect including (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance, (2) whether any hostile motions were made with the weapon towards the officers, (3) the distance separating the officers and the suspect, and (4) the manifest intentions of the suspect. *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). The consideration of these factors highlights the extent of the genuine factual dispute in this case.

Here, there is a genuine dispute about whether any officer ever ordered Denison to stop or warned of the use of deadly force between the time he left his hiding place and the time he was shot and killed, there is no dispute that Defendant Aragon gave no commands or warning to Denison at all before opening fire and striking him with at two bullets.

As to whether Denison made hostile motions towards the officers, it is important to limit the context of the assessment to Denison's encounter immediately prior to the use of deadly force—i.e., his encounter with Defendants Aragon and Sedler. To consider Denison's alleged brandishment against Sergeant Frick a significant factor ignores the passage of time (approximately one-and-a-half hours) and change in circumstances, and creates a risk that an alleged past showing of a weapon to an officer will necessarily mean that officers may shoot on sight. The important consideration in this case—and the source of another genuine factual dispute—is whether Denison ever made any hostile motions towards Defendants. As to Defendant Aragon, Denison certainly did not threaten him because Denison almost certainly did not know Defendant Aragon was even present. Defendant Aragon himself admits that he felt no fear for his own safety. As to Defendant Sedler, there is a factual dispute over whether Denison pointed his weapon at or even knowingly ran towards Defendant Sedler. Plaintiff's contention is that the police helicopter video shows that Denison is not threatening officers, but running for his life after coming under sniper fire not once but twice given Officer Purdue's accidental discharge[7].

As for the distance, even assuming Defendants are correct and fifteen yards or conversely forty-five feet (See Defendants' UMF Nos. 50) was the distance it cannot be disputed that forty-five feet is a substantial distance given the overwhelming organization, numbers, and firepower that the police brought to bear. Officers had at their disposal an armored personnel carrier capable of withstanding rounds from significantly more powerful weapons that Denison was believed to have had. They knew that every exit was blocked by highly-trained officers. They had a "kill zone" parameter set up so that Denison could not avoid escape. They had a range of less-lethal weaponry

---

[7] It is worthy to note that Officer Purdue's accidental discharge struck the building that Dennison was hiding in front of and despite this Officers never made any motions or communications to endure that the occupants (if any were inside) were not harmed. This shows that their concern was not on ensuring that the surrounding public were safe but rather to ensure Denison was shot and killed when he got up from his hiding position. See Plaintiff's Supplemental Fact KK.

at their disposal. They had closed nearby roadways and secured bystanders behind locked doors. They had powerful and accurate rifles and night vision, not to mention thermal imaging technology in the helicopter flying overhead. Under the circumstances, the distance between Defendants and Denison was ample.

Finally, as noted above, there is a genuine dispute about whether Denison made any hostile movements towards Defendant Sedler and the other officers for whom he was providing cover. Plaintiff contends that video evidence shows Denison to have been running for his life after coming under sniper fire, and that he never pointed his weapon at Defendants Aragon or Sedler.

Another consideration is whether the suspect's actions rise to a level warranting deadly force. *See Scott v. Harris*, 550 U.S. 372, 383-84 (2007). This consideration requires the court to weight the degree of risk created by the suspect against the degree of risk created by the officer's use of force. *Id.* at 384. The *Scott* court determined that a fleeing motorist posed an actual and imminent threat to the lives of others, and weighed that risk against the likelihood that the officer's use of force (ramming the suspect's vehicle to cause a crash) would threaten the suspect's life. The court noted that ramming a vehicle does not present the near certainty of death to the suspect that shooting a person at close range does. *Id.*

As a preliminary matter to balancing those risks in this case, it is important to appropriately identify the risk to others created by Denison's actions, and to do so based on objective facts considered in the light most favorable to Plaintiff. Defendants rely on their concern for bystanders and other officers in their justification of the use of deadly force, specifically on the concern that Denison might hypothetically escalate his level of aggression from brandishing a gun at an officer to taking innocent hostages at a nearby restaurant or hotel. This concern is overly speculative and is not objectively reasonable. The Supreme Court in *Graham* called for courts to focus on the objective factors facing the police, not on the officers' subjective speculations. If we allow law

enforcement to deploy force merely because they predict someone may become aggressive, then the Fourth Amendment guarantee will have no meaning. *Graham v. Connor*, 490 U.S. 386 (1989).

Officer Aragon is clear and it is undisputed that he did not fear for himself but articulates as the only reason for shooting Dension is his speculative fear and hypothetical risk that Denison might harm others. See Plaintiff's Undisputed Fact "T". However, this is undercut by what Defendant Aragon knew at the time he shot Denison as shown in Plaintiff's Supplemental Facts E-M, R-T, V, W, and Z. He knew (1) that a parameter had been set up, (2) that the stores were all secured and locked down, (3) that Officer Purdue was set up with a sniper rifle across the street with his sights locked on Dennison and to provide cover for Officers; and (4) that tactical officers were on their way in a Bearcat armored vehicle "in order to contact [Denison] and initiate a dialogue…" See Doc. 15 at page 2. *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699701 (10th Cir. 1995) ("The reasonableness of [officers'] actions depends both on whether the officers were in danger at the precise moment that they used force and on whether [officers'] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.") Additionally, "[a] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). Defendant's subjective and speculative fear about what may have happened does not justify his use of deadly force. See *Curley v. Klem*, 298 F.3d 271, 280 (3d Cir. 2002) (officer's overly-hasty resort to force could not be excused even by "the great pressure and intensity inherent in [t]he police officer's hot pursuit of a suspect known to be armed and highly dangerous.").

The hypothetical risk to others is not itself sufficient to justify the use of deadly force against a fleeing suspect. *Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009). In *Cordova*, the Tenth Circuit considered whether summary judgment was appropriate where an officer shot and killed a fleeing motorist. *Id.* Although it was not disputed that the motorist was driving a heavy

truck the wrong way down the highway in an attempt to evade police, disputed facts about whether any other motorists were actually in danger compelled the court to find that the risk to others was not imminent and therefore did not justify the use of deadly force. *Id.* ("Mr. Cordova's behavior did, of course, create risks for other motorists who might come along, but that risk of future harm was not enough to justify the near certainty of Mr. Cordova's death.")

In *Cordova v. Aragon*, the Tenth Circuit determined that the general risks created by a motorist's fleeing from the police are, without more, insufficient to justify a shooting that is nearly certain to cause the suspect's death. *Cordova*, 569 F.3d 1183 at 1190 (10th Cir. 2009). The Court dismissed the Officer's argument regarding the threat to the public traveling on the road because the remote and speculative possibility that someone would be placed in danger without more did not justify the killing of the suspect. The court was clear that it wanted to distinguish *Scott v. Harris*, 550 U.S. 372 (2007) in that it did not want officers to believe that *Scott* gave officers a blanket approval of any use of deadly force just because a suspect is attempting to flee. This case came down years before Denison's death.

In February 2009, an APD officer used unreasonable force when he shot and killed Andrew Lopez after officers attempted to pull Lopez over for driving with dim headlights and no tail lights. According to officers, they suspected the vehicle had been involved in a prior incident in which a gun was reported. After leading the officers on a low-speed vehicle chase for more than ten minutes, Lopez stopped the vehicle, exited, and ran toward a driveway of a residence where a truck was parked. One officer gave chase on foot, followed by approximately four other officers. The primary officer stated that he believed Lopez was armed with the biggest handgun he had ever seen and ordered him to drop it. When Lopez reached a fence and began to turn, the officer shot at Lopez three times. In a bench trial in New Mexico state court, Honorable Judge T.

Baca found that the officers' testimony about the threat they perceived from Lopez was not credible and concluded that the shooting was unreasonable. Judge Baca further found that the training provided to APD officers on use of deadly force "is not reasonable and is designed to result in the unreasonable use of deadly force." Based on the testimony of the City of Albuquerque's own police training expert (a training officer for the City of Albuquerque), the training provided to City of Albuquerque police officers, on the use of deadly force, is not reasonable and is designed to result in the unreasonable use of deadly force. See, Findings of Fact and Conclusions of Law, Honorable Judge Theresa Baca, *Higgins v. City of Albuquerque*, No. CV-20090915 (N.M. 2d Judicial Dist. filed on Aug. 19, 2009), ¶66-67.

Here, applying the balancing of risk as in *Scott*, the starting point should be the absolute certainty of death that officers accepted when they shot Denison five times with powerful, accurate rifles from their fixed positions. Two of Aragon's bullets fired from a high powered 308 sniper rifle hit Denison as he was running for his life. At least two of Defendant Sedler's rounds fired from a 223 high powered weapon struck Denison in the chest, and the chances of his survival after such a show of force is extremely small. Plaintiff's Supplemental Fact CC.

On the other hand is the hypothetical risk posed by Denison. Considering the facts in the light most favorable to Plaintiff, from the time he left his hiding place he did not threaten officers with his gun, and instead manifested an intention only to escape police and their gunfire by running away. That Denison hypothetically could have entered a locked restaurant, crossed streets that had been closed and secured by officers and had a Bearcat Armored vehicle approaching, made it past a police dog who was also there to be deployed against Denison, run past Defendant Sedler's heavily armed arrest team, or somehow made his way to a hotel, which was already on lock down, two blocks away simply does not constitute the imminent risk of death or serious injury to others that might otherwise have justified Defendants' use of deadly force.

18

Separate from the consideration of the various factors identified in *Larsen* and *Scott*, for example, and used to assess the threat posed by a suspect, there are circumstances where the suspect does pose a risk to other, but deadly force is not justified because the officer unreasonably created that risk. *See Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) ("In addition to considering whether the officers reasonably believed they were in danger at the time they used force, we have considered whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.") (internal quotations omitted).

Here, Defendants created a situation in which Denison could not move from his hiding place without being shot. It was always the Officers plan to stop any movement made by Denison. So no matter where he went, the moment he got up from his hiding spot he was going to get shot by Officers. They were actively trying to get him to move from his location because the helicopter was running low on fuel. See Plaintiff's Supplemental Fact LL. Officers devoted considerable resources to surrounding Denison in his hiding place. They had the benefit of time, numbers, and resources to monitor Denison's location and movements and thereby limit risks to officers, the public, and Denison. However, Defendants created a situation—by their own description—where Denison's movement in *any direction* from his hiding place would present an opportunity to engage with officers and this was precisely so they could engage him and shoot him. However, Defendants did nothing to warn Denison that he had been placed in a situation where any movement would— according to Defendants—justify the use of deadly force.

Separating for the court the two uses of deadly force is necessary as even if the court finds that the use of deadly force by Sedler was reasonable it should not hold that the use of deadly force by Defendant Aragon was reasonable. Defendant Aragon unreasonably prepared to use force with his lethal firearm drawn and pointed, before he even attempted to ascertain whether Denison was a threat to anyone, thus his readiness to use force was not related to any objectively apparent threat.

Denison's movement in leaving his hiding spot and running away from it across a street alone does not constitute an objectively reasonable basis to use deadly force.

### D. Count I—Unreasonable Seizure

A tip from a known person, the reliability of whose account is unknown, is not by itself sufficient to justify a seizure. Even brief investigative detentions constitute a seizure and must meet two distinct requirements to be "reasonable under the Fourth Amendment. First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). Second, the detention that follows the stop must be reasonably related in scope to the circumstances" that justified the stop in the first place. *Terry v. Ohio*, 392 U.S. 1, 20 (1968).

Here, Defendant Frick received a tip from the owner of a music store that two males had, the day before, tried to sell stolen merchandise, and were sitting in a vehicle over a football field away. See Plaintiff's Supplemental Fact A and B. Defendants have not presented facts to suggest that Frick had any additional information about the alleged crime, the person offering the tip, or the people alleged to have attempted to sell stolen items. The Court, viewing the facts in the light most favorable to Plaintiff, must assume that Defendant Frick had no additional information and acted on the basis of the tip alone. This information, without further verification, does not constitute reasonable suspicion to engage in the seizure of Denison. Therefore, Defendants did not have reasonable suspicion, much less probable cause, to seize Denison.

Next, Frick admits that he did what is known as a felony or high risk stop. Doc. 15 Defendants' Undisputed Fact No. 5. Frick conducted a high-risk stop, also known as a felony stop, which is much more serious than a traffic or an investigatory stop because it involves aggressively extracting vehicle occupants at gunpoint and handcuffing them on the ground. APD SOP 2-55(H) attached hereto as Exhibit 12 states:

H.        HIGH RISK STOP

A high risk stop (felony stop) is a method of stopping, removing, disarming, and detaining occupants of a vehicle who are believed to be dangerous, violent, and/or armed with a deadly weapon.  The high risk stop utilizes officers, cover, and assigned areas of responsibility and structured orders to stop a vehicle and remove occupants while reducing the risk of danger to citizens and the responding officers.

This was excessive given what Frick actually knew at the time of the stop. Frick escalated the situation before he ever made contact with Dension. Frick also admits that he pointed his gun at Denison.  Doc. 15 Defendants' Undisputed Fact No. 11.  "[T]he pointing of firearms should [,however,] be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time." *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) (ellipsis and internal quotation marks omitted). "[T]he pointing of firearms should [however,] be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time." *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) (ellipsis and internal quotation marks omitted). Unlawful force leading to an unjustified shooting is also unconstitutional.

Denison was seized when Frick blocked in the car that he was a passenger inside of as well as when pointed his gun at Denison. Denison was subjected to a de-facto arrest given the highly intrusive means by which Smith approached him. By his own admission in conducting a high-risk felony stop, Frick escalated the encounter with Denison from an investigatory nature to a de-facto arrest and seizure. See UMF 5 and 11. See also, *United States v. Maez*, 872 F.2d 1444, 1450-51 (10th Cir.1989) (defendants were effectively arrested when police surrounded house and ordered them to come out).

Last, Defendants arguments regarding what crime Denison would have been charged with are not relevant given the correct analysis is what the officers knew at the time of the initial seizure.

Further, the officer's subjective belief is irrelevant[8]. The officer's own subjective reason for the arrest is irrelevant, and it does not matter whether the arrestee was later charged with a crime. See *Devenpeck v. Alford*, 543 U.S. 146, 152-53 (2004).

**E. Failure to warn prior to the use of deadly force is presumptively unreasonable.**

Deadly force is not justified unless "where feasible" a warning has been given. "[W]henever practicable, a warning *must* be given before deadly force is employed." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997). Defendants own standard operating procedures mandate that a warning should be given. SOP 2-52-3 (D) states, "[w]hen feasible, some warning should be given prior to engaging in the use of deadly force." SOP 2-52-3(D), Exhibit 11.

Here, neither Defendant warned Denison that they were about to use deadly force. In fact, Denison is unlikely even to have known that Defendant Aragon and Sedler were ready with guns aimed and ready, waiting to shoot him dead when he moved in any direction. Defendant Aragon was hiding behind a two-foot tall wall on top of a two-story building, and needed to use his night vision goggles to see Denison. Defendant Sedler was half a block away, crouched at the corner of a building. The only warning given by Defendants was gunfire. Use of deadly force under these circumstances is objectively unreasonable.

**F. Waiver of Immunity**

Regardless of the Court's ruling on Defendants' Motion as to the federal constitutional claims, Plaintiffs' New Mexico Tort Claims Act claims against Defendants should survive because

---

[8] As stated in *United States v. Treto-Haro*, 287 F.3d 1000, 1006 (10th Cir. 2002) "as we recently explained in *United States v. Santana–Garcia*, 264 F.3d 1188, 1192 (10th Cir.2001), a law enforcement officer's subjective belief as to the existence of probable cause to arrest is not determinative of the lawfulness of the arrest. We measure probable cause against an objective standard and evaluate it in relation to the circumstances as they would appear to a prudent, cautious and trained police officer. The subjective belief of an individual officer as to whether probable cause existed for detaining a criminal suspect is not dispositive."

different legal elements, standards, and precedent control the analysis. More importantly, the New Mexico Tort Claims Act states that, if a waiver of immunity exists, then "[l]iability for acts or omissions under the Tort Claims Act shall be based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." NMSA 1978, § 41-4-2(B); *see also Lopez, Sr. v. Las Cruces Police Dep't*, 2006-NMCA-074, ¶ 12, 139 N.M. 730 ("[L]itigants err to the extent that they import notions of pleading from federal civil rights cases into state TCA actions."). *See also Caillouette v. Hercules*, Inc., 1992-NMCA-008, 113 N.M. 492, 497; *Wells v. Valencia Cnty.*, 1982-NMSC-048, 98 N.M. 3, 5-6 ("Tortious conduct which does not amount to a constitutional violation does not state a cause of action under Section 1983, but may be fully compensable under a state remedy for a tortious loss.") (citations omitted). However, New Mexico, as any state, has the right to read its state constitutional provisions more broadly than the United States Constitution. New Mexico courts consider an analysis under state constitutional law to be unnecessary if the United States Constitution provides full protection. *See, e.g., State v. Wagoner*, 2001-NMCA-014, 130 N.M. 274. Plaintiff has already shown that Defendants' conduct ran afoul of the United States Constitution, but it also ran afoul of the New Mexico Constitution.

Given the seizure of and use of force against Denison was illegal and that Defendants violated Denison's Fourth Amendment right, Plaintiffs' state law tort claims also survive. Pursuant to NMSA 1978, Section 41- 4-12, police officers' immunity does not extend to the commission of those torts[9]. As explained, Defendant Officers did not fully comply with the requirements of the Fourth Amendment. Thus, examining the undisputed facts and drawing all reasonable inferences in favor of Plaintiff, a reasonable jury could find in their favor on her tort claims. Further, Plaintiff is

---

[9] Plaintiff claims the officers are liable for assault, battery, false arrest, and false imprisonment.

afforded greater protection under the New Mexico Constitution. See *State v. Gomez*, 1997-NMSC-006, ¶ 23, 122 N.M. 777 ("There is established New Mexico law interpreting Article II, Section 10 more expansively than the Fourth Amendment.")

## IV.    CONCLUSION

Disputed material facts preclude an entry of summary judgment for Defendants in this case. The factual record in favor of Plaintiff (non-movant) shows that Mr. Dension's rights were violated. Further, qualified immunity does not shield Defendants from suit resulting from their actions.  This Court should therefore deny Defendants' *Motion*.

Respectfully submitted,
LAW OFFICE OF FRANCES CROCKETT

*/s/ Frances Carpenter*
Frances Carpenter
Hans Erickson
925 Luna Circle NW
Albuquerque, NM 87102
Phone: (505) 314-8883
Fax: (505) 835-5658
*Attorneys for Plaintiff*

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record via the CM/ECF fining system this 12th day of June, 2015.

*/s/ Frances Carpenter*
Frances Carpenter