## IN THE UNITED SATE DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CHARLOTTE INGRAHAM, *as personal representative*
*of the Estate of Parrish Denison*,

      Plaintiff,

      v.                              Case No. 15-cv-308 SCY/KBM

CITY OF ALBUQUERQUE, *et al.*,

      Defendants.

## MEMORANDUM OPINION AND ORDER

In their Motion for Summary Judgment (*Doc. 15*), Defendants Anthony Sedler[1] and Francisco Aragon, Albuquerque police officers, assert qualified immunity and ask the Court to dismiss Plaintiff Charlotte Ingraham's claims that they unlawfully seized and then shot Parrish Denison on March 5, 2013. Plaintiff opposes the Motion on the bases that (1) factual disputes preclude the entry of summary judgment and (2) the factual record, viewed in the light most favorable to Plaintiff, supports a finding that Mr. Denison's constitutional and state law rights were violated. *Doc. 27 at 24*. Having reviewed the briefing, including Plaintiff's response (*Doc. 27*) and Defendants' reply (*Doc. 31*), and being apprised of the relevant law, the Court has determined that (1) Plaintiff's unlawful seizure, false arrest, and false imprisonment claims are legally deficient, (2) both Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment excessive force claims, but (3) because a jury could find that Defendant Aragon acted unreasonably, only Defendant Sedler is entitled to dismissal of Plaintiff's state law assault and battery claims.

---

[1] The parties agree that Defendant Sedler's name is misspelled as "Seddler" in the caption of Plaintiff's complaint. *Doc. 15* at 1; *Doc. 27* at 1. The Court, therefore, orders that the caption be corrected and that all future filings reflect this modification.

I.     **Factual Background**

   A.  **Officer Frick**

On March 5, 2013, at around 6:11 p.m., Sean Frick, an Albuquerque police department officer, was sent to investigate a call regarding the attempted sale of stolen musical instruments at the Music-Go-Round on Menaul Boulevard. *Doc. 15*, Ex. A ¶¶ 1-3; *Doc. 27*, Ex. 1 at 1. While en route to the store, dispatch informed Officer Frick that the caller who had reported the attempted sale was complaining that two men, who were possibly involved with the theft, were parked nearby[2] in a black pick-up truck. *Doc. 15*, Ex. A ¶ 4. According to the caller, these men had brought stolen merchandise to the store on a previous occasion. *Id.* When Officer Frick arrived on the scene, he located a black pick-up truck, parked behind the truck to prevent it from leaving, and activated his emergency lights. *Id.* ¶ 7. Immediately thereafter, a man jumped out of the truck and started running away. *Id.* ¶ 8. Officer Frick chased this man, yelling "Stop, police." *Id.* ¶ 11. The man, however, continued to flee, eventually climbing onto the roof of a neighboring building. *Id.* ¶ 12. At this point, Officer Frick called for help to assist him in catching the suspect. *Id.* ¶ 15. According to Officer Frick, the suspect then pulled a handgun out of his waist band, twice pointed this gun at Officer Frick, and escaped. *Id.* ¶¶ 16-22.

Plaintiff disputes Officer Frick's narrative, including Officer Frick's claim that the suspect, who was later identified as Parrish Denison, had a firearm and pointed this firearm at Officer Frick. *Doc. 27* at 7. To support this position, Plaintiff points out that Officer Joey Tosta, who was also on the scene, did not see the suspect with a handgun. *Doc. 27*, Ex. 11. This information has limited value, however, because Officer Tosta could not see the suspect at all

---

[2] According to Officer Frick, dispatch advised that these men were parked in the strip mall parking lot where the Music-Go-Round was located. *Doc. 15*, Ex. A ¶ 4. Plaintiff disputes this fact because the CAD report states that the suspects were parked in front of the jewelry store, *Doc. 27*, Ex. 1 at 2, which Plaintiff claims was located across the street. *Doc. 27* at 7. Because the location of the pick-up truck is not relevant to the issues raised in Defendants' motion for summary judgment, the Court need not resolve this dispute.

times. *Id.* (noting that Officer Tosta lost sight of the suspect after the suspect ran northbound). Moreover, to the extent Officer Tosta's statements undermine Officer Frick's account, this is ultimately immaterial. For the purposes of determining whether Defendants – Officers Sedler and Aragon – acted lawfully, it does not matter whether Officer Frick actually saw Mr. Denison with a firearm and whether Mr. Denison actually pointed this firearm at Officer Frick. All that matters is what Officers Sedler and Aragon reasonably believed about this prior encounter. The Court has included a factual section told from Officer Frick's perspective merely to provide context for discussing Plaintiff's claims.

### B.  Officer Aragon

On March 5, 2013, at approximately 7:00 p.m., while at his girlfriend's house, Francisco Aragon, a member of the Albuquerque police department SWAT team, received a call to assist with a search for an armed suspect. *Doc. 15*, Ex. C ¶¶ 2-3; *Doc. 27*, Ex. 4 at 5:1-19. As it turns out, the missing suspect in question was Parrish Denison, the individual who escaped from Officer Frick. Officer Aragon, however, was not in possession of this information when he answered the call. All he knew was that police were looking for an armed suspect. *Doc. 15*, Ex. C ¶ 3; *Doc. 27*, Ex. 4 at 5:20-24. As he was driving to the scene, he learned that the police department's Air 1 helicopter had located the suspect. *Doc. 15*, Ex. C ¶ 4; *Doc. 27*, Ex. 4 at 6:3-12. The following events are best told in Officer Aragon's own words:

> When I arrived on scene, I got dressed in my Albuquerque Police Department SWAT uniform which contains markings that identify me as a police officer.
>
> As I was changing, my sergeant informed me that there was an officer who had access to the roof to the Chili's restaurant that was located near the intersection of Menaul and Lousiana [sic] so he asked me to set up a high ground position from that location.
>
> My primary role as a high ground officer is to observe, provide tactical team members information based upon my observations, and to provide cover for tactical team members who are on the ground.

When I arrived at the Chili's, I met up with Officer Tosta at the front door of the Chili's who opened the locked door and let me inside.

While inside the Chili's I noticed that the restaurant was completely packed with civilians and there were also officers inside the restaurant as well.

I made my way through the kitchen area and down a hallway which I believed connected to other businesses which were in the same building as the Chili's. From there, I found the stairway to the roof of the building.

Once on the roof, I positioned myself on the southeast corner of the building.

From the roof, I looked for the wanted suspect and I also received verification from the Air 1 helicopter unit stating that the suspect was in the next parking lot just east of where I was in front of a four-door pickup truck, hiding amongst some bushes that were just north of the truck.

After receiving the verification of the suspect's location, I tried looking through the optics on my M4 rifle to try to see if I could see the suspect but I was unable to locate him. I then tried looking through the scope of my .308 rifle and I still could not see the suspect so I put on my night vision optics which then allowed me to see the bushes and the vehicle which Air 1 had verified.

Once I was able to locate the bushes and pickup truck, I started looking for any type of movement so that I could identify and locate the suspect.

I didn't see any movement for a while. As I was still looking for movement, I heard a gunshot go off and it was immediately advised the radio [sic] that it was an accidental discharge. I did not notice any movement from the bushes and the pickup truck immediately after the accidental discharge.

As the Air 1 helicopter was orbiting up above, they reported a couple of times that they had seen the suspect laying with his head to the east and his feet to the west in the area of the bushes and the pickup truck.

I did not see any movement from the subject until the entry team started moving west on Menaul in the BearCat armored vehicle. It was at this point that I saw the top of the bush move and then I saw a head move. When I saw the head move, I saw that the subject had on a baseball cap.

I then observed the subject look east towards the entry team and the BearCat and then tuck back into the bushes. As the entry team moved closer I called out what I had observed.

4

> After the subject tucked back into the bushes, I could not see his face, but I could still see the top of his head.
>
> As the entry team continued to make their way west on Menaul they started to put light on the general area of where the suspect was. The suspect then stood up and moved out from behind the bushes and the vehicle where he had been hiding.
>
> As he got up from hiding behind the bushes and the vehicle, he moved to the front of the vehicle and it was at this point that I saw that he had a handgun in his right hand. I then fired a round at him . . . . He was still armed with the gun after I fired a round and he began running. The subject ran onto northbound Chama. I then fired a second round . . .

*Doc. 15*, Ex. C ¶¶ 5-21. This series of events occurred over roughly an hour time span (between 7:06 p.m., when Officer Aragon was driving to work and the suspect was first located by the Air 1 helicopter, and 8:11, the time of the shooting). *Doc. 27*, Ex. 1 at 5; *Doc. 15*, Ex. C ¶ 4; *Doc. 27*, Ex. 4 at 6:3-12; *Doc. 16*, Ex. B1 at 20:11:14-25. The Air 1 helicopter video recorded the shooting. *Doc. 16*, Ex. B1 at 20:11:14-25. While the timing of Officer Aragon's shooting cannot be pinpointed exactly on the video, the video clearly depicts Mr. Denison moving away from the bushes in a fluid movement and eventually running north/northwest on Chama. *Id.* During this time period, when Officer Aragon's shooting occurred, Mr. Denison's hands remain in a normal swinging position; he never raises his arms as if to point or shoot his weapon. *Id.* at 20:11-14-20.

### C.  Officer Sedler

Like Officer Aragon, Anthony Sedler, was at home and on call with the Albuquerque police department SWAT team the night of March 5, 2013 when he received a 7:00 p.m. message to help with a search for an armed suspect. *Doc. 15*, Ex. D ¶ 2-3; *Doc. 27*, Ex. 3 at 6:3-8. Officer Sedler responded to this message and arrived on the scene around 7:30 to 7:45 p.m., at which time he was stationed with other officers in a containment position north of the Chili's restaurant just off Chama Street. *Doc. 15*, Ex. D ¶¶ 5-6; *Doc. 15*, Ex. D1. The officers stationed with Officer Sedler informed him that the suspect they were looking for had "pulled a firearm"

on another officer. *Doc. 15*, Ex. D ¶ 7. From the helicopter team, Officer Sedler learned that the suspect was believed to be hiding in some bushes on the east side of Chama on the north side of a building complex. *Id.* ¶¶ 8, 10. *Doc. 15*, Ex. D1. Officer Sedler, however, could not see the bushes from his position. *Doc. 15*, Ex. D ¶ 11.

Per his instructions, Officer Sedler maintained his position behind the building housing the Chili's restaurant in order to provide containment should the suspect flee north. *Id.* ¶¶ 12-13. At some unidentified point in time, he heard a rifle discharge that was reported to be accidental. *Id.* ¶ 15. He continued to wait as the arrest team approached the suspect with a public address system. *Id.* ¶¶ 16-18. As the arrest team moved closer to the suspect, Officer Sedler suddenly heard another shot and saw that a person "had rounded the corner of the business complex which was on the northeast corner of Menaul and Chama." *Id.* ¶¶ 18-19. This individual ran north and then northwest, holding a firearm in his hand. *Id.* ¶ 21. Officer Sedler observed the other officers stationed with him throw a Noise Flash Diversionary Device at the suspect and then yell at him to stop and drop his gun. *Id.* ¶¶ 22-23.[3] The individual did not stop, but ran directly west towards the building complex on the northwest corner of Menaul and Chama. *Id.* ¶ 24. He then jumped in the air and tried to kick open a door to this building. *Id.* ¶ 25. At this time, Officer Sedler shot the suspect three times in quick succession. *Id.* ¶¶ 26-29. He was standing roughly 15 yards away throughout this shooting. *Id.* ¶ 28.

---

[3] Plaintiff objects to the Court considering evidence that Officer Sedler saw other officers throw a flash device and heard these officers yell at Mr. Denison to stop and drop his gun. *Doc. 27* at 8-9. Plaintiff contends that such evidence is inadmissible hearsay. *Id.* This is incorrect. Hearsay is defined as a statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c)(2). Officer Sedler's observations of other officers using a flash device are not hearsay. Nor are his recollections about what was shouted, because these overheard commands were not assertions and are not being offered to prove the truth of the matter asserted. *Echo Acceptance Corp. v. Household Retail Servs.*, 267 F.3d 1068, 1087 (10th Cir. 2001) ("[I]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.").

Officer Sedler claims that the suspect turned towards him after he fired his first shot. *Id.* ¶ 27. At this point, around 20:11:24 on the video, Officer Sedler maintains Mr. Denison pointed his gun at him and the other officers who were standing with him. *Id.* The video recording confirms that Mr. Denison was wildly waiving his right hand (which is holding a black object) at this time as he rebounded from running into the glass door. *Doc. 16*, Ex. B1 at 20:11:24-25. On the video, it appears that Mr. Denison moved his right arm, which was facing north towards the officers, in a backwards arc. The video does not support a finding, however, that Mr. Denison turned and pointed his firearm at the police in a purposeful manner. *Id.*

## II.     Standard of Review

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). A dispute is "genuine" if sufficient evidence exists for a rational trier of fact to resolve the dispute either way. A factual dispute is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).

The party seeking summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the nonmoving party to designate specific facts

showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, then, the Court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002).

### B. Qualified Immunity Defense

When an individual defendant asserts qualified immunity, the procedure for analyzing the defendant's motion for summary judgment is slightly different than normal. Qualified immunity protects public officials from liability under federal law "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Therefore, any time a defendant asserts qualified immunity, including at the summary judgment stage, the burden shifts to the plaintiff to show (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established at the time of defendant's conduct, i.e. the contours of the right were sufficiently well developed that a reasonable official should have known his conduct was unlawful. *Courtney v. Okla. ex rel. Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013). The overarching inquiry is whether the law at the time of defendant's conduct provided defendant with "fair notice" regarding the legality of that conduct. *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). As is commonly reiterated, qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

An assertion of qualified immunity does not, however, permit the Court to resolve genuine disputes of material fact in favor of the defendants. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). Like with all motions for summary judgment, the Court's role is to assess the sufficiency of the plaintiff's evidence rather than its believability. In this regard, when ruling on a qualified immunity motion, the Court adopts the plaintiff's version of the facts. *Id.*; *Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405, 411 (10th Cir. 2014) ("When the defendant has moved for summary judgment based on qualified immunity, we still view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor."); *see also Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (evaluating a qualified immunity summary judgment motion by drawing factual inferences in the light most favorable to the plaintiff, the nonmoving party).[4]

## III.    Illegal Seizure

Plaintiff contends that Mr. Denison was unlawfully seized within the meaning of the Fourth Amendment when Officer Frick, a non-party, "blocked in the car that [Mr. Denison] was a passenger inside of" and then pointed his gun at Mr. Denison. *Doc. 27* at 21. Defendants argue that Plaintiff's claim fails as a matter of law because Mr. Denison fled from Officer Frick and a person is not seized within the meaning of the Fourth Amendment unless that person is successfully restrained or otherwise willingly submits to the officer's show of authority. *Doc. 15* at 14. Defendants maintain that application of this rule requires the Court to find that Mr. Denison was not seized until after he was shot, subdued, and handcuffed. *Id.* at 15. Alternatively, Defendants maintain that any seizure of Mr. Denison was lawful because there was reasonable

---

[4] In their Motion for Summary Judgment, Defendants suggest that the Court should not view the evidence in the light most favorable to Plaintiff. *See Doc. 15* at 12 ("Normally, the summary judgment standard requires a court to review the evidence in the light most favorable to the non-moving party. However, when a defendant raises the qualified immunity defense on summary judgment, a plaintiff has the burden to meet a strict two-part test."). This suggestion is incorrect.

suspicion to briefly detain him for investigative purposes. *Id.* at 16. Because Defendants' motion for summary judgment can be decided on other, clearer grounds, the Court declines to address these arguments.

Defendants have asserted qualified immunity on Plaintiff's unlawful seizure claim. This shifted the burden to Plaintiff to produce evidence that **Defendants**, not some third-party, violated Mr. Denison's constitutional rights. Plaintiff has not satisfied this burden. An individual defendant cannot be held liable under § 1983 unless that defendant personally participated in the specific constitutional violation at issue. *See Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011) ("§ 1983 imposes liability for a defendant's own actions . . ."); *Foote v. Spiegel*, 118 F.3d 1416, 1423-24 (10th Cir. 1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."); *Trujillo v. Williams*, 465 F.3d 1210, 1228 (10th Cir. 2006) ("In order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation . . . must be established."). Here, the undisputed evidence establishes that neither Defendant Sedler nor Defendant Aragon played any role in the initial decision to stop Mr. Denison – they were not on the scene, let alone at work, at the time Officer Frick first approached and attempted to detain Mr. Denison. Thus, they cannot be held liable for Officer's Frick's decision to conduct a felony stop on the vehicle in which Mr. Denison was sitting and the Court must dismiss Plaintiff's unlawful seizure claims with prejudice.[5]

---

[5] Plaintiff does not argue that Defendants' actual participation in the apprehension and death of Mr. Denison – joining other officers to create a perimeter surrounding his hiding place and then shooting him – gives rise to stand-alone unlawful seizure claims separate from the excessive force claims discussed below. Given Officer Frick's representation that, by the time Officers Aragon and Sedler arrived, Mr. Denison had brandished a firearm at a police officer, this argument would not be viable. At any rate, the Court now considers it abandoned. Further, the Court does not interpret Defendants' argument that Mr. Denison was not seized until handcuffed as an attack on the viability of Plaintiff's excessive force claims (police did not handcuff Mr. Denison until after they shot him). Defendants do not ask the Court to dismiss Plaintiff's excessive force claims on this basis and the Court will not raise this argument *sua sponte*. Instead, the Court will treat this argument as abandoned and will evaluate the merits of the excessive force claims assuming, as do the parties, that Defendants' shooting of Mr. Denison violates the Fourth Amendment if this shooting was unreasonable.

IV.     **Excessive Force**

It is well-established that "[t]he degree of physical coercion . . . law enforcement officers

may use [to apprehend a suspect] is not unlimited, . . . and all claims that law enforcement

officers have used excessive force in the course of an arrest, investigatory stop, or other seizure

of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness'

standard." *Cortez v. McCauley*, 478 F.3d 1108, 1125 (10th Cir. 2007) (internal citations omitted).

This standard is simple in theory: the force employed during a detention is unconstitutional if it

is objectively unreasonable in light of the situation facing the officer. *Id.* at 1126; *Cordova v.

Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009). In practice, however, there is often no easy

answer to whether a particular use of force is excessive. In each excessive force case, the Court

must "slosh . . . through the fact-bound morass" of information confronting the officer and

carefully "weigh the nature and quality" of the Fourth Amendment intrusion against "the

importance of the governmental interested alleged to justify the intrusion." *Cordova*, 569 F.3d at

1188. The intentions of the officer – either good or bad – play no role in this balancing; an

officer's use of force is reasonable only if it is justified by the totality of circumstances facing

that officer. *Id.*

Three non-exclusive factors guide the above analysis: the severity of the crime, the level

of threat the suspect poses to officer and public safety, and the amount of resistance to or

compliance with arrest exhibited by the suspect. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Cases involving the use of deadly force typically hinge on the second factor – the level of threat

the suspect poses to officer and public safety. This is because the Supreme Court has directed

that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the

harm resulting from failing to apprehend him does not justify the use of deadly force to do so."

*Tenn. v. Garner*, 471 U.S. 1, 11 (1985). In accordance with this instruction, the Tenth Circuit has repeatedly held that "[d]eadly force is justified under the Fourth Amendment if a reasonable officer in [the defendant's] position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008); *Phillips v. James*, 422 F.3d 1075, 1083 (10th Cir. 2005).

The Tenth Circuit has identified four sub-factors for courts to consider in evaluating the threat a suspect poses to officer and public safety: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Larsen*, 511 F.3d at 1260. While these sub-factors are not exclusive, by focusing attention on the immediacy of the threat and the likelihood that the threat might culminate in actual harm, they provide context for understanding what type of threat is serious enough to warrant the use of deadly force: one that is urgent and concrete, rather than merely speculative. Thus, while there are not "rigid preconditions" that must be satisfied before an officer may exercise deadly force, *Scott v. Harris*, 550 U.S. 372, 382 (2007), it is nonetheless clear that the immediacy of the threat that provoked the use of force is a critical ingredient in the reasonableness analysis. *See Larsen*, 511 F.3d at 1260 ("In this case, Appellant's claim of excessive force centers on whether Larsen posed an <u>immediate</u> threat to the officers or the safety of others."); *Phillips*, 422 F.3d at 1083 ("Critical ingredients in the totality of the circumstances' inquiry in this case include whether the officers were in danger at <u>the precise moment</u> that they used force . . ."); *Jiron v. City of Lakewood*, 392 F.3d 410, 418 (10th Cir. 2004) (noting that one of the factors to be considered in the excessive force analysis is whether the suspect "poses an <u>immediate</u> threat to the safety of the officers or others" and

reasoning that "[b]ecause Plaintiff placed Officer Halpin in fear of '<u>imminent</u> serious bodily injury' with a deadly weapon, Officer Halpin's use of deadly force to defend herself was clearly reasonable."); *King v. Hill*, No. 14-5073, 2015 U.S. App. LEXIS 10660, at *13-14 (10th Cir. June 24, 2015) ("A reasonable officer would not have shot Mr. King unless he had a reasonable belief that Mr. King posed an <u>immediate</u> threat justifying the use of deadly force.") (emphasis added to all citations).

This is not to say that "the risk to others must always be imminent in order to justify the use of deadly force." *Cordova*, 569 F.3d at 1190. For example, when a suspect repeatedly threatens officers and refuses to comply with commands to put down his firearm and cooperate with the police, an officer does not need to wait for this suspect raise his gun before shooting him. *Phillips*, 422 F.3d at 1083-1084. In such a case, the threat to officer safety is certainly serious and immediate enough to justify the use of deadly force. *Id.* In contrast, the Tenth Circuit has reasoned that officers are not permitted to shoot a fleeing suspect who is armed with a knife, even one who has revealed a disregard for officer safety by nearly hitting an officer with his vehicle, if this suspect has not threatened officers, is not sufficiently close to be a danger to officers, and has not otherwise shown that he poses an immediate risk to anyone. *Walker v. City of Orem*, 451 F.3d 1139, 1159-1160 (10th Cir. 2006). In this type of scenario, where the threat to officer and public safety is no more than a mere possibility, the use of deadly force would be precipitous. *Id.*; *see also Cordova*, 569 F.3d at 1190 (explaining that just because a suspect's conduct creates some slight risk of serious physical harm, this does not mean an officer may automatically use "any application of force, no matter how certain to cause death" and concluding that the generalized risk created by a suspect's reckless driving did not justify shooting the suspect); *Zia Trust Co. v. Montoya*, 597 F.3d 1150, 1154-1155 (10th Cir. 2010) (van

stuck on retaining wall that jumped forward less than a foot while officer was fifteen feet away did not entitle officer to summary judgment in lawsuit brought by driver who officer shot); *Zuchel v. Spinharney*, 890 F.2d 273, 275 (10th Cir. 1989) (denying qualified immunity to an officer who, while standing fifteen feet away, shot a man who had been kicking the glass door of a McDonald's and was believed to be holding a knife). Through this line of cases, the Tenth Circuit has put police officers on notice that deadly force is not an appropriate reaction to a general, but highly uncertain, risk that harm might occur in the indefinite future. As with all uses of force, before employing deadly force to subdue a dangerous suspect, an officer is expected to assess the degree of the threat the suspect poses and consider whether the force contemplated is warranted in light of this threat. *Cordova*, 569 F.3d at 1189-1190.

It is important to note, however, that when a court is called to evaluate an officer's assessment of threat and decision to use deadly force, the court must always keep in mind "that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Id.* at 1200. An exercise of force is not unreasonable simply because it appears avoidable with the 20/20 vision of hindsight. *Graham*, 490 U.S. at 396. The touchstone of a Fourth Amendment excessive force analysis is, and always remains, the reasonableness of the use of force as viewed from the perspective of an officer on the scene. *Id.*

### A. Officer Sedler

Although Officer Sedler was the second officer to shoot Mr. Denison, the Court will first address the excessive force claim asserted against him. The parties do not dispute that Officer Sedler received a call around 7:00 p.m. to assist with a search for an armed suspect (Mr. Denison). Once Officer Sedler reported to the scene, he followed his supervisor's instructions to

join other officers in creating a perimeter around Mr. Denison's suspected hiding place in an effort to provide containment should he attempt to flee. Other officers stationed with Officer Sedler informed him that Mr. Denison had "pulled a firearm" on another police officer. *Doc. 15*, Ex. D ¶ 7. Officer Sedler was also made aware that an arrest team would be approaching Mr. Denison to make contact. As this team approached, Officer Sedler heard a shot and saw Mr. Denison running around the corner of a building north/northwest towards his location. He observed that Mr. Denison was carrying a firearm.[6]

At this point, other officers stationed with Officer Sedler (1) lobbed a noise flash diversionary device at Mr. Denison and (2) yelled at him to stop and drop his firearm. Mr. Denison, however, continued running, turned west, jumped in the air, and attempted to kick open a door to a nearby building. At this point, Mr. Denison was standing roughly 15 yards away from Officer Sedler. To prevent Mr. Denison from breaking into the building and evading police capture, Officer Sedler shot Mr. Denison three times in quick succession, causing Mr. Denison to fall to the ground with his gun still in his hand.

Even when viewed in the light most favorable to Plaintiff, these facts demonstrate that Mr. Denison posed an immediate and serious risk of harm to officer and public safety at the time Officer Sedler discharged his firearm. It was objectively reasonable for Officer Sedler to believe Mr. Denison (1) was armed with a firearm, (2) had previously threatened police with this

---

[6] Plaintiff denies this fact on the basis that the helicopter video does not show a gun in Mr. Denison's hand. *Doc. 27* at 8. It is true that the video is not close enough to see a gun in Mr. Denison's hand prior to Officer Sedler's shooting. But, at 20:11:24-26, it does show a dark object in Mr. Denison's right hand. *Doc. 16*, Ex. B1. Three officers have testified that this object was a firearm, including one who confirmed that Mr. Denison still had a gun in his hand after he was shot and had fallen to the ground. *Doc. 15*, Ex. C ¶ 21; *Doc. 15*, Ex. D ¶ 21; *Doc. 15*, Ex. E ¶ 12. Plaintiff has not produced any evidence to rebut this sworn testimony (i.e. evidence from which a jury could find that the officers incorrectly said Mr. Denison had a gun). Thus, there can be no genuine dispute of fact regarding Mr. Denison's possession of a firearm and the Court must accept this fact as true in ruling on Defendants' motion. *See Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245, 1250 (10th Cir. 2012) ("In a summary-judgment proceeding a party's assertion of undisputed facts is ordinarily credited by the court unless properly disputed by the opposing party.").

firearm, (3) was within shooting distance of Officer Sedler, (4) was refusing to comply with police commands, and (5) was actively attempting to elude capture. Despite these facts, Plaintiff contends that Mr. Denison did not pose an immediate threat because the officers had sufficient power and means to stop Mr. Denison without resorting to the use of deadly force and because Mr. Denison never made hostile movements towards the officers. Plaintiff's arguments are not convincing. First, prior to Officer Sedler's shooting, officers had unsuccessfully attempted to stop Mr. Denison with less lethal force (verbal warnings and a flash device). Mr. Denison's response was to continue fleeing and to attempt to break into a building where he may have been able to avoid the police and then place police and the public at even greater risk. Second, in cases such as this one, where an armed suspect has threatened the police with a firearm and is standing in close proximity to these officers and refusing to comply with police commands, police need not wait for that suspect to point his gun at the police for a shooting to be reasonable. *See Thomson v. Salt Lake County*, 584 F.3d 1304, 1318 (10th Cir. 2009) (holding that it was reasonable for the officers to believe that a suspect was an immediate threat to police or to others in the neighborhood when that suspect "was in possession of a firearm, was known to have threatened his wife with a firearm, . . .  had not put his weapon down as instructed by the officers" and "was moving his gun up and down quickly," including in the direction of the officers); *Phillips*, 422 F.3d at 1083-1084 (holding that it was reasonable for an officer to shoot a suspect who had access to firearms, was within shooting distance of the police, and had repeatedly threatened officers and refused to comply with police commands).

As the Court understands it, Plaintiff's position is that Mr. Denison was not like the suspects in the above cases because Mr. Denison was merely running for his life, trying to escape the officers, rather than actively threatening them. The problem with this argument is that Officer

16

Sedler reasonably believed that Mr. Denison had previously threatened another officer as part of the same escape attempt. Given this information, Officer Sedler was then forced to make a quick decision in a rapidly changing situation about whether to shoot Mr. Denison or wait and risk allowing Mr. Denison to take aim at Officer Sedler or other officers in the area or to possibly enter what may have been an occupied building while armed and on the run. Courts have approved officer shootings in similar situations. *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001) (explaining that it was reasonable for an officer to shoot an armed robbery suspect during a foot chase when the suspect turned towards officer and reached as if for a gun); *Ford v. Childers*, 855 F.2d 1271, 1276 (7th Cir. 1988) (officer did not violate the Fourth Amendment by shooting a fleeing bank robber who was believed to be armed with a deadly weapon and who refused commands to halt); *Ryder v. Topeka*, 814 F.2d 1412, 1421 (10th Cir. 1987) (finding that a jury could reasonably infer that a suspect posed a serious risk of harm to others when police were chasing this suspect down a darkened alley, the police believed the suspect was both armed and prone to violence, the suspect's hands were in her pockets, and she was about to run around a building into a darkened residential area"); *Davis v. McCarter*, 569 F. Supp. 2d 1201, 1206-1207 (D. Kan. 2008) ("The Court finds little difficulty in determining that [Defendant's] use of deadly force to apprehend [Plaintiff] was justified under the circumstances. . . . [Plaintiff] was running [from the police] through a residential neighborhood holding a gun. . . . Under the circumstances it was reasonable for [Defendant] to use deadly force to prevent [Plaintiff] from locating cover and shooting at [Defendant] and his partner . . . [Plaintiff] acknowledges that [Defendant] ordered him to stop and drop his gun several times, but that he did not comply and kept running with his gun in his hand."). The Court will not second-guess Officer Sedler's decision to use deadly force in a situation similar to those multiple courts have found to present a

serious and immediate risk of harm to officer and public safety. Given the information known to him at the time of the shooting, Officer Sedler's decision to use deadly force against Mr. Denison was reasonable.

Normally, this would necessitate a finding that Officer Sedler had not violated Mr. Denison's constitutional rights. Plaintiff, however, has raised an alternative theory of liability. Plaintiff maintains that even if the Court finds Mr. Denison posed a serious risk of harm justifying the use of deadly force, Defendants are nonetheless liable for the shooting because they unreasonably, through their own reckless or deliberate conduct, created the need for the use of deadly force. *Doc. 27* at 19. While it is true that courts in excessive force cases must consider both (1) whether the officer acted reasonably the moment he used force and (2) whether his own reckless or deliberate conduct unreasonably created the need to use force, *Thomas v. Durastanti*, 607 F.3d 655, 664 (10th Cir. 2010), Plaintiff has not cited to any case law to support her claim that it was reckless or improper for Defendants to create a perimeter around an armed and fleeing suspect. In the absence of such law, the Court refuses to issue a finding that setting up a perimeter, a routine police procedure, is unreasonable and could create liability for officers who react, in an otherwise reasonable manner, to a suspect who, through his own flight, comes into contact with the perimeter. Thus, the Court will grant Officer Sedler's motion for summary judgment.

## B. Officer Aragon

### i. Viewed in the light most favorable to Plaintiff, the evidence supports a finding that Officer Aragon's decision to shoot Mr. Denison was unreasonable.

Defendants contend that Officer Aragon's decision to shoot Mr. Denison was reasonable for the same reasons that Officer Sedler's decision was reasonable. *Doc. 15* at 21-22. In line with

this position, rather than analyzing the two officers' uses of force separately, Defendants discuss

them jointly. The circumstances confronting Officer Aragon, however, differed significantly

from the circumstances facing Officer Sedler. Drawing all reasonable factual inferences in favor

of Plaintiff, at the time of Officer Aragon's first shot, (1) Officer Aragon had no knowledge of

Mr. Denison's prior threatening conduct, (2) neither Officer Aragon nor any other officer had

provided Mr. Denison with a warning or other order, (3) Mr. Denison arguably was not close

enough to any civilians or other officers to constitute an immediate threat, and (4) Mr. Denison,

while moving away from this hiding place, was not yet running.

     Defendants ignore these differences and ask the Court to find that Officer Sedler and

Officer Aragon both used objectively reasonable deadly force. To support this position,

Defendants emphasize that Mr. Denison had allegedly assaulted another officer with a firearm.

*Doc. 15* at 21; *Doc. 31* at 16. The evidence does not, however, support a finding that Officer

Aragon knew about this alleged assault. As a result, it is irrelevant to the Court's evaluation of

Officer Aragon's conduct. The reasonableness of a particular use of force must be judged in light

of the circumstances and information confronting the officer. *Weigel v. Broad*, 544 F.3d 1143,

1152 (10th Cir. 2008); *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015) ("[A] court must

judge the reasonableness of the force used from the perspective and with the knowledge of the

defendant officer.").

     Here, it is undisputed that Officer Sedler knew Mr. Denison brandished a firearm at an

officer. But, Officer Aragon did not (according to the evidence presented to the Court) have the

same knowledge. The only evidence Defendants have identified to support a finding that Officer

Aragon knew about Mr. Denison's prior threatening conduct is the CAD report, which contains

an entry at 18:39:25 with the comment "aggravated assault on an officer." *Doc. 15*, Ex. G at 3.

Because the Court must draw all factual inferences in favor of Plaintiff, the Court cannot, without more, assume that Officer Aragon heard or knew about this comment. Even if it were inclined to do so, any such assumption would be contrary to the evidence in the record, which indicates that Officer Aragon was not at work when the comment was broadcast at 18:39:25. Moreover, unlike Officer Sedler, Officer Aragon never states in his affidavit or elsewhere that, prior to shooting Mr. Denison, he learned of Mr. Denison's threatening encounter with Officer Frick.

The difference in Officer Aragon and Officer Sedler's knowledge is critical. Because Officer Sedler reasonably believed that Mr. Denison had threatened another officer with a firearm during his escape attempt, the first and third *Graham* factors clearly weighed in his favor. The same cannot be said of Officer Aragon. The first *Graham* factor concerns the severity of a suspect's crime. As far as Officer Aragon knew, Mr. Denison had not committed a serious or dangerous crime. The third *Graham* factor concerns the amount of a suspect's resistance to or compliance with arrest. While Mr. Denison had run from the police, thereby "attempting to evade [detention] by flight," *Graham*, 490 U.S. at 396, he had not, as far as Officer Aragon knew, actively resisted detention in any other manner. As this analysis shows, both the first and third *Graham* factors suggest that it was unreasonable for Officer Aragon to use deadly force against Mr. Denison.

As for the second and most important *Graham* factor, the level of threat posed by Mr. Denison to officer and public safety, the evidence presented to this Court does not establish, as a matter of law, that Mr. Denison posed a risk of harm so serious and immediate that it was necessary for Officer Aragon to shoot him. Aside from the general (but not insignificant threat)

20

created by Mr. Denison's flight and holding of a firearm, [7] the *Larsen* factors, which the Tenth Circuit considers in evaluating the level of threat a suspect poses, do not support Officer Aragon's conclusion that Mr. Denison was highly dangerous.

       *1)*     *Compliance with Police Warnings and Commands*

It is undisputed that the police did not give Mr. Denison any warnings to drop his weapon or to surrender to police custody between the time they located his hiding place and the time when he stood up and Officer Aragon shot him. It has long been established that, where feasible, a warning should be given prior to using deadly force to prevent the escape of a dangerous suspect. *Thomson*, 584 F.3d at 1321. Here, drawing all reasonable factual inferences in favor of Plaintiff, such a warning was feasible. A little over an hour elapsed between the time police first located Mr. Denison (7:06 p.m.) and the time Officer Aragon shot him (8:11 p.m.). *Doc. 27, Ex. 1* at 5; *Doc. 16*, Ex. B1 at 20:11:14-25. During this period, officers formed a perimeter around Mr. Denison's hiding spot. At some point during this process, Officer Aragon stationed himself on the roof of a neighboring building. Then, some minutes before the shooting, an arrest team in an armored vehicle began approaching Mr. Denison. Officer Aragon was in direct communication with this arrest team. Yet, neither Officer Aragon nor anyone else issued a warning before Officer Aragon shot Mr. Denison.

According to Officer Aragon, he fired his first shot because he believed the suspect "posed a deadly threat to tactical team members." *Doc. 15,* Ex. C ¶ 21. The the conduct of those very officers, however, undercuts this belief. As Mr. Denison ran towards Officer Sedler and his

---

[7] As already discussed, Plaintiff declines to unreservedly admit that Defendants observed Mr. Denison holding a gun. Instead, Plaintiff responds to Defendants' assertion that Officer Aragon saw Mr. Denison with a handgun by stating that she "does not have information at this time to either admit or deny" this fact and furthermore, disputes that this fact is material. *Doc. 27* at 8. This response in no way rebuts Officer Aragon's sworn affidavit. Thus, for the purposes of this Motion, the Court finds no genuine dispute that Officer Aragon saw Mr. Denison holding a firearm prior to shooting him.

companions, they identified themselves as police, shouted out commands, and used a flash device prior to shooting at Mr. Denison. If they felt safe enough to be able to warn Mr. Denison prior to resorting to the use of deadly force, viewing the evidence in the light most favorable to Plaintiff, the Court cannot say that Officer Aragon, an officer who was not personally in danger, reasonably decided to shoot without warning.

The case Defendants cite to support their claim that a warning is not required before the use of deadly force – *Thomson*, 584 F.3d 1304 – is distinguishable. In *Thomson*, police responded to a 911 call informing them that the suspect, Mr. Thomson, had pointed a gun at his wife. *Id.* at 1309-10. By the time they arrived on the scene, Mr. Thomson had left the house armed with a gun. The police proceeded to search the surrounding neighborhood, which was dark, looking for Mr. Thomson. *Id.* at 1310. During this time period, a police lieutenant made cell phone contact with Mr. Thomson, identified himself, and told Mr. Thomson that he did not want to see anyone get hurt. *Id.* Mr. Thomson replied that "if he did not want his officers to get hurt, he should have them leave the area." *Id.* The lieutenant passed this information along to the officers, who then released a police dog to locate Mr. Thomson. As the officers approached Mr. Thomson and the dog, they repeatedly warned Mr. Thomson to drop his gun and come out with his hands up. *Id.* Mr. Thomson did not comply; instead, he waved his gun in the direction of the officers, causing one of the officers to shoot Mr. Thomson. *Id.* at 1310-11.

Importantly, the lack of warning in *Thomson* preceded the release of a police dog (which the Tenth Circuit determined did not constitute lethal force under the circumstances of that case), not a lethal shot from a rifle. Whether police may reasonably release a police dog without warning is an entirely different issue than whether police may fire a potentially fatal shot without warning. In *Thomson,* <u>police extended several warnings before shooting Mr. Thomson.</u> *Id.* In this

regard, *Thomson* reinforces the standard that, when feasible, police must issue a warning before employing deadly force. Additionally, unlike in the present case, in *Thomson*, before using any force, including the police dog, the police communicated with the suspect and were threatened in response. Thus, the issue on appeal was the specificity of the warnings provided to Mr. Thomson; the Tenth Circuit did not find that it was reasonable for a police officer to shoot a suspect who, to the officer's knowledge, had not threatened police and with whom the police had no verbal contact. Defendant has not identified and the Court is not aware of any case suggesting that deadly force would be reasonable under these circumstances.

2)      *Hostile Motions*

As far as Officer Aragon was aware, Mr. Denison had not used his firearm to make any overtly hostile motions towards police (or anyone else) prior to the shooting. Defendants' assertions to the contrary, namely their insistence that Officer Aragon knew about Mr. Denison's alleged assault of Officer Frick, lack evidentiary support. Granted, at the time of the shooting, Officer Aragon knew that a suspect was armed and had fled from the police. But while this understandably heightened Officer Aragon's concerns for the safety of other officers and citizens in the area, the firing of a weapon is not a per se reasonable method for capturing a noncompliant suspect, even one armed with a gun. *Luna v. Mullenix*, 773 F.3d 712, 722 (5th Cir. 2014) ("[A]llegedly being armed and in a car fleeing are not, by themselves, sufficient to establish that [a suspect] posed such an imminent risk of harm that deadly force was permitted.").

The only other potentially hostile or dangerous action Mr. Denison made was moving away from this hiding place. Defendants overstate the significance of this movement when they argue that, at the time of the shooting, Mr. Denison posed an immediate threat because he "took off running in the direction of officers while still armed." *Doc. 31* at 16. As part and parcel of

this position, they insist that Officer Aragon only shot Mr. Denison after Mr. Denison suddenly took off running. *Doc. 15* at 21; *Doc. 31* at 8, 16. At this stage in the proceedings, the Court is not free to accept this defense-favorable characterization of the facts. Officer Aragon represents that he fired his first shot **before** Mr. Denison began running. *Doc. 15,* Ex. C. ¶ 21 ("He was still armed with the gun after I fired a round and he began running"). He states that he fired his second shot as Mr. Denison ran onto northbound Chama. *Id.* The helicopter video, on which Defendants rely to show that Mr. Denison was running before the shooting, depicts Mr. Denison hiding behind a bush, then, in one fluid motion, rising from behind the bush, stepping away from the bush, and eventually sprinting west/northwest. Considered alone, the video does not establish when Officer Aragon fired his shots.[8] Viewed in the light most favorable to Plaintiff, on the other hand, Officer Aragon's affidavit supports a finding that Mr. Denison was not running when he was first shot. Additionally, it is undisputed that, other than continuing to hold a gun, Mr. Denison took no hostile action between the time he stood up and when he was first shot.

With regard to the second shot, neither party has asked the Court to separately analyze the reasonableness of Officer Aragon's two shots. Even if they had, however, exactly when the second shot occurred is not clear and, at this stage of the proceedings, the Court must draw all factual inferences in favor of Plaintiff. After doing so, the Court concludes that the second *Larsen* factor, which focuses the court's attention on any hostile motions or threatening gestures made by a suspect, does not support Defendants' claim that it was reasonable for Officer Aragon to shoot Mr. Denison.

---

[8] Defendants identify "two flashes [on the video] at approximate time 20:11:19 which appear not to even strike Mr. Denison" and suggest that these two flashes are Officer Aragon's two shots. Defendants have not, however, produced any evidence to support this assertion.

3)      *Distance Separating Mr. Denison from Potential Victims*

According to an interview he gave following the March 5, 2013 shooting, Officer Aragon

did not believe he was in any immediate danger at the time he shot Mr. Denison, but instead

acted to protect others in the area. *Doc. 27*, Ex. 4 at 14:8-11. As a result, in this case, the distance

between Officer Aragon and Mr. Denison has little relevance to the reasonableness analysis. The

determinative issue is whether Mr. Denison was close enough to other officers or civilians to

have placed these individuals in serious danger. Specifically, Officer Aragon has explained that

he believed Mr. Denison posed an immediate threat to (1) the arrest team, (2) the other officers

stationed in the area, including those located north of Menaul just off Chama, and (3) members

of the public, specifically those in the Sheraton Hotel and the Chili's restaurant. *Doc. 15*, Ex. C

¶¶ 21-22. Significantly, none of these individuals appear to have been in Mr. Denison's line of

fire at the time Officer Aragon shot Mr. Denison.

> A member of the arrest team described his experience of the shooting as follows:
>
> As the arrest team moved westbound on Menaul, it was reported that the suspect was
> moving and running onto Chama. I then heard the sound of gunshots and a Noise Flash
> Diversionary Device ("NFDD"). I am not sure in which order that I heard these sounds. I
> turned on my helmet video camera once I and the other members of the arrest team
> arrived at the intersection of Chama and Menaul Blvd.

*Doc. 15*, Ex. E ¶¶ 7-8. As written, this description suggests that the arrest team could not see Mr.

Denison at the time of the shooting. The helicopter recording of the incident also supports a

finding that the arrest team was some distance away when the shooting occurred. On this video,

Mr. Denison moves out of the bushes around 20:11:16, but the arrest team does not arrive at the

corner of Menaul and Chama until 20:12:37, over a minute later. *Doc. 16*, Ex. B1. Viewing this

information in the light most favorable to Plaintiff, the Court cannot conclude that the arrest team

was close enough to Mr. Denison to be in immediate danger. This is especially true given that

Mr. Denison was not moving towards the arrest team at the time of the shooting (*Doc. 16*, Ex. B1 at 20:11:14-25) and the arrest team was using an armored BearCat vehicle for cover and concealment (*Doc. 15*, Ex. C ¶17; *Doc. 27*, Ex. 7).

Like with the arrest team, the Court does not have detailed information about the distance that existed between Mr. Denison and the various ground officers at the time of Officer Aragon's shooting. In his post-shooting interview, Officer Aragon explained that, while he knew other officers were in the area, he was not sure what these ground officers were doing, because he "didn't have a visual on them." *Doc. 27*, Ex. 4 at 38:2-23. Similarly, in his affidavit, he expresses a generalized concern for the "tactical team," but does not, with the exception of the officers stationed with Officer Sedler on Chama, identify where these various ground officers were located or why he believed they were at risk when Mr. Denison stood up and began moving.  The absence of this information is critical as, to justify the use of deadly force, the threat at issue must have been more than a mere possibility. Here, the only officers who Officer Aragon knew to be in the immediate path of Mr. Denison were the officers stationed on Chama north of Menaul. According to the maps provided to the Court, these officers appear to have been standing about half a block north of Mr. Denison's hiding place. Viewing the evidence in the light most favorable to Plaintiff, at the time Officer Aragon fired his first shot, a building stood between Mr. Denison and the officers. *Doc. 15*, Ex. D ("I next heard another rifle report and I saw that a person had rounded the corner of the business complex . . ."); *Doc. 27*, Ex. 3 at 31:14-24 (from his position, Officer Sedler could not see Mr. Denison's hiding place); *Doc. 16*, Ex. B1 at 20:11:14-25.

The Court recognizes that the other officers quickly came into Mr. Denison's line of sight when Mr. Denison rounded the corner of the building next to which he had been hiding.  The

Court also recognizes that, at the time Mr. Denison stood up, Officer Aragon could not predict Mr. Denison's next action and it may have been difficult for Officer Aragon to effectively intervene if Mr. Denison became an immediate threat by running in the direction of other officers and ignoring officer orders, as he did. Nonetheless, drawing all reasonable inferences in favor of Plaintiff, when Officer Aragon first shot at Mr. Denison, Mr. Denison was not sprinting away and the officers stationed around the corner were not in his line of fire. Therefore, with regard to these officers, the third *Larsen* factor slightly weighs in Plaintiff's favor.

Consideration of the distance between Mr. Denison and members of the public also slightly weighs in Plaintiff's favor. At the time Officer Aragon shot Mr. Denison, police had closed the surrounding streets and created a perimeter. They had instructed nearby businesses to lock down. *Doc. 27*, Ex. 1 at 2-7. The closest civilians, as identified by Officer Aragon, were those located in the Chili's restaurant and Sheraton Hotel. *Doc. 15*, Ex. C ¶ 22. Officer Aragon had personal knowledge that the Chili's had been told to lock their doors and keep everyone inside for their own safety. *Id.* ¶ 8; *Doc. 27*, Ex. 4 at 26:14-27:15. No member of the public appears to have been outside and near Mr. Denison at the time Officer Aragon shot him. If deadly force were justified by concern that an armed and fleeing suspect might get away and soon thereafter pose a danger to the public, police could use deadly force against every armed and fleeing suspect. The Court is aware of not case that supports this contention.

### 4) *Manifest Intentions*

Viewed from the perspective of Officer Aragon, Mr. Denison's intentions at the time of the shooting remain largely opaque. Officer Aragon did not know why police were attempting to detain Mr. Denison or why Mr. Denison had fled. As far as he knew, Mr. Denison had not spoken with police or made non-verbal contact with them since his original flight. While Mr.

27

Denison's holding of a gun suggests a generalized hostile intent, Officer Aragon had no

knowledge that Mr. Denison had threatened anyone.

     *5)*     *Totality of the Circumstances*

     Defendants have not identified and the Court is not aware of any other facts that justify

Officer Aragon's use of deadly force.  As previously discussed, Defendants' primary arguments

about the reasonableness of Officer Aragon's conduct rely on an incorrect rendition of the factual

situation confronting Officer Aragon. At the time Officer Aragon shot Mr. Denison, Officer

Aragon knew: (1) Mr. Denison had fled from police; (2) Mr. Denison continued to attempt to

evade capture; (3) Mr. Denison possessed a firearm; (4) Mr. Denison moved away from his

hiding position as officers approached; and (5) officers and citizens were generally present but

not in the immediate area. Considered as a whole and drawing all reasonable inferences in favor

of Plaintiff, these facts do not create probable cause that Mr. Denison posed such an urgent and

serious threat to officer and public safety that it was reasonable for Officer Aragon to shoot him.

     The Court has reached this conclusion based on its own assessment of the evidence as

well as a comparison of this case to the other cases where the Tenth Circuit evaluated the

reasonableness of an officer shooting. *See*, *e.g.*, *Durastanti*, 607 F.3d at 665 (although ATF agent

who shot at a fleeing vehicle had not identified himself as a law enforcement officer, he was in

immediate danger of being run over and "a reasonable officer could certainly conclude that the

Lincoln's occupants had notice of police presence"); *Thomson*, 584 F.3d at 1320 ("The

undisputed evidence paints a picture that the officers were faced with an armed suspect in an

agitated condition, who ignored repeated warnings to drop his weapon, and appeared willing and

able to attack. Accordingly, we do not find this use of force to be excessive . . .") (internal

citations omitted); *Larsen*, 511 F.3d at 1260 (prior to the shooting both officers repeatedly told

the suspect to put down the knife); *Phillips*, 422 F.3d at 1083-1084 (shooting was reasonable, at least in part, because suspect "repeatedly refused to cooperate with the officers when they requested that he put down his weapon"); *Jiron*, 392 F.3d at 412 (before shooting a fifteen-year-old suspect, officer repeatedly told the suspect to exit the bedroom and drop her knife; when the suspect refused, the officer warned her that she would shoot if she did not stop); *Ryder*, 814 F.2d at 1415 (officer yelled "Halt, police," before foot chase that resulted in shooting of suspect). These cases demonstrate that, absent an immediate threat, police must warn a suspect before using deadly force. In this case, while Officer Aragon reasonably concluded that Mr. Denison was intentionally and knowingly fleeing from the police, Officer Aragon lacked sufficient reasons to conclude that Mr. Denison was so imminently dangerous that it was reasonable to shoot him without any warning.

The Court is cognizant that Mr. Denison's decision to flee the police while holding a firearm created a justifiable concern about risks to others and led to the stressful nature of the situation facing Officer Aragon. The Tenth Circuit has made clear, however, that generalized risks are not enough to justify shooting a suspect who is not otherwise known to be dangerous. *See Cordova*, 569 F.3d at 1190 (even giving deference to the "split-second decisions of trained officers reacting to difficult situations," a court cannot say that "the general risks created by a motorist's fleeing from the police are, without more, enough to justify a shooting that is nearly certain to cause that suspect's death"); *Walker*, 451 F.3d at 1160 (mentally unstable suspect who was holding a knife and jogging away from police "was not actively resisting arrest, and there was no need to use deadly force to prevent him from fleeing and possibly harming others").

To be clear, the Court is not saying that Officer Aragon's conduct was definitively unreasonable, but, as in *Cordova*, "only that the contrary has not been established as a matter of

law, based on the undisputed facts in the record," which must be viewed in the light most favorable to Plaintiff. *Cordova*, 569 F.3d at 1192. The Court's analysis rests, as it must, on an understanding of the facts about the timing of the shooting, the distances involved, and the layout of the scene that benefits Plaintiff. For example, because the undisputed facts could reasonably support a finding that no other officers or persons were sufficiently near Mr. Denison to justify Officer Aragon's shots, the Court has adopted this view of the facts. This does not mean, however, that Defendants could not convince a jury that Mr. Denison posed such an immediate danger to officer and public safety that Officer Denison's shooting was reasonable. At this stage in the proceeding, the Court is barred from drawing inferences from the facts in Defendants' favor. Because Plaintiff has presented sufficient facts for a jury to conclude that Officer Aragon acted unreasonably in shooting Mr. Denison, Officer Aragon is not entitled to summary judgment on the merits of Plaintiff's Fourth Amendment claim.

> **ii.    Officer Aragon is, however, entitled to qualified immunity.**

Plaintiff would have the Court's analysis stop here without a consideration of the second prong of the qualified immunity test. *Doc. 27* at 12 (arguing that the two prongs of the qualified immunity test pose the same question in excessive force cases and need not be addressed separately). This was once the prevailing practice in excessive force cases. *See Quezada v. County of Bernalillo*, 944 F.2d 710, 718 (10th Cir. 1991); *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991). In 2001, however, the Supreme Court rejected this approach. There, the Court held that the second prong of the qualified immunity analysis was not "susceptible of fusion" with the first prong – the prong that addresses the merits of a plaintiff's constitutional claim – even in excessive forces cases. *Saucier v. Katz*, 533 U.S. 194, 197 (2001); *see also Ealum v. Schirard*, 46 F. App'x 587, 591 (10th Cir. 2002) (*Saucier* "required that the two-part test be used

in all qualified immunity cases, including those where excessive force was an issue"). The Tenth

Circuit has recognized that *Saucier* overruled *Quezada* in this limited regard. *See Buck v. City of*

*Albuquerque*, 549 F.3d 1269, 1288 (10th Cir. 2008). The Court must therefore separately

consider whether Officer Aragon is entitled to qualified immunity because he lacked fair notice

that his conduct was unconstitutional. For the reasons discussed below, the Court concludes that

Officer Aragon did not, in fact, possess fair notice regarding the legality of his conduct and

should be immune from suit.

The general principles governing the use of excessive force are well-established.

"[D]eadly force is justified only if a reasonable officer in the officer's position would have had

probable cause to believe that there was a threat of serious physical harm to himself or others."

*Cordova*, 569 F.3d at 1192. In applying this rule, the Tenth Circuit has made clear that deadly

force is not an appropriate reaction to a general, but highly uncertain, risk that harm might occur

in the indefinite future, but is only reasonable where the risk of harm at issue is serious and

urgent. *Supra pages 11-14*. While these principles are well-settled, they are not terribly specific.

As the Tenth Circuit has noted, the general principles just described "still beg[] the question of

what constitutes a . . .  threat" that is serious and immediate enough for deadly force to be an

acceptable response. *Cordova*, 569 F.3d at 1193.

Here, Officer Aragon is entitled to qualified immunity because the case law does not

provide sufficient notice to officers regarding how a court would evaluate the seriousness and

immediacy of a threat posed by fleeing suspect who is armed with a firearm. Cases that suggest

that Officer Aragon's conduct was unreasonable – such as *Walker* and *Cordova* – do not involve

firearms. On the other hand, in most of the cases where a fleeing suspect possessed a firearm,

courts have found officer shootings to be reasonable. *See*, *e.g.*, *Phillips*, 422 F.3d 1075;

*Thomson*, 584 F.3d 1304; *Thompson*, 257 F.3d 896; *Ford v. Childers*, 855 F.2d 1271; *Ryder v. Topeka*, 814 F.2d 1412; *Davis v. McCarter*, 569 F. Supp. 2d 1201. These cases do not demonstrate that Officer Aragon used reasonable force because they all involve suspects who threatened officers and/or suspects who disobeyed officer orders to surrender and relinquish their weapons. But neither do they provide fair notice that the degree and immediacy of the danger Mr. Denison had created at the time Officer Aragon shot him failed to justify the use of deadly force. *See Herrera*, 589 F.3d at 1070 (qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."). In short, the law in this area is still developing and Officer Aragon's conduct falls in a gap within the case law. In such a case, the officer should be entitled to qualified immunity unless the force used was so clearly unjustifiable under the *Graham* factors that the officer should have known his behavior was unconstitutional. *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (acknowledging that a plaintiff's right to be free from excessive force may be clearly established even in the absence of prior similar case law if the plaintiff makes a showing that the conduct was "obviously egregious . . . in light of prevailing constitutional principles"). Officer Aragon's conduct is not clearly egregious in this manner. For this reason, the Court will enter summary judgment in Officer Aragon's favor on the issue of qualified immunity.

### C.  State Law Claims

Plaintiff also asserts state law claims against Officers Sedler and Aragon for assault, battery, false arrest, and false imprisonment. *Doc. 1*, Ex. A. Plaintiff has not explained the factual theory supporting each of these claims, but the Court assumes that the false arrest and false imprisonment claims mirror Plaintiff's unlawful seizure claim and the assault and battery claims mirror Plaintiff's excessive force claim. Thus, the Court will dismiss Plaintiff's false arrest and

false imprisonment claims because Plaintiff has not presented any evidence that Defendants participated in the alleged arrest and imprisonment of Mr. Denison. Similarly, the Court will dismiss Plaintiff's assault and battery claims against Officer Sedler because the evidence Plaintiff has presented could not support a jury verdict that Officer Sedler acted unreasonably. The Court will not, however, dismiss Plaintiff's assault and battery claims against Officer Aragon.

In New Mexico, the lawfulness of an officer's use of force depends on whether the officer was "exercising reasonable and necessary force, or unreasonable, and therefore, excessive force." *State v. Ellis*, 144 N.M. 253, 259 (2008); *see also Reynaga v. County of Bernalillo*, No. 94-2182, 1995 U.S. App. LEXIS 24230, at *4 (10th Cir. Aug. 25, 1995) ("[A] law enforcement officer is not civilly liable for using such force as may reasonably be necessary in the enforcement of law and the preservation of order.") (internal citations omitted). When law enforcement officers acts in good faith, by making a reasonable determination about the amount of force necessary in a particular situation, "the courts will afford them the utmost protection." *Mead v. O'Connor*, 66 N.M. 170, 173 (1959). In general, the reasonableness of a particular use of force is a question for the jury. *Id.*; *St. John v. McColley, 653 F. Supp. 2d 1155, 1165 (D.N.M. 2009)* ("[A] jury must determine whether Defendants [law enforcement officials] are protected by having acted reasonably and in good faith."). For all of the reasons discussed above, the Court concludes that Plaintiff has produced sufficient evidence to proceed to the jury on her claim that Officer Aragon acted unreasonably in shooting Mr. Denison.

IT IS THEREFORE ORDERED THAT:

1. Defendants' Motion for Summary Judgment (*Doc. 15*) is granted in part and denied in part as follows:

a. The Court will dismiss Plaintiff's claims against Defendant Anthony Sedler with prejudice.

b. The Court will dismiss, with prejudice, Plaintiff's Fourth Amendment claims and Plaintiff's false arrest and false imprisonment claims against Defendant Francisco Aragon.

c. Defendants' Motion is denied as to Plaintiff's assault and battery claims as asserted against Defendant Francisco Aragon.


STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE