IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CHARLOTTE INGRAHAM,
as Personal Representative for the
Wrongful Death Estate of
PARRISH DENISON, deceased,
    Plaintiff,

    vs.                                    15-cv-00308-SCY-KBM

CITY OF ALBUQUERQUE et al,
    Defendants.

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

    Plaintiff, by and through his attorneys, Frances Carpenter and Hans Erickson, hereby submits this Motion for Summary Judgment as to Plaintiff's state law claims against Defendant Francisco Aragon (hereinafter, "Aragon") for assault and battery resulting in the death of Parrish Denison (hereinafter, "Denison"). Defendants oppose this Motion.

**I.    Introduction**

    This Court has already considered a defense motion for summary judgment on Plaintiff's federal constitutional claims of excessive force (Fourth Amendment) and state claims of assault, battery, false imprisonment, and false arrest. Doc. 15. The Court granted summary judgment on all claims except for the state assault and battery claims against Aragon. Doc. 34. With respect to the federal claims against Aragon, the Court determined that Aragon had committed a constitutional violation by using excessive force against Denison. However, the Court also determined that Aragon was entitled to qualified immunity because the law was not clearly established about the use of force in the particular factual scenario presented in this case, namely, where a suspect is armed

1

with a firearm versus some other potentially deadly weapon, such as a car. Doc. 34 at 31-32. However, the Court denied summary judgment on the state assault and battery claims because Aragon acted unreasonably, as the Court discussed at length in its analysis of the Fourth Amendment claims.

Plaintiff is now bringing this Motion for Summary Judgment on the state assault and battery claims, based on the same events addressed in Defendants' motion (Doc. 15), and seeking judgment against Aragon because the level of force he used was not objectively reasonable.

II.     **Statement of Undisputed Material Facts**

1. On March 5, 2013, at approximately 7:00PM, while at his girlfriend's house, Aragon, a member of the Albuquerque Police Department's SWAT team, received a call to assist with a search for an armed suspect. Doc. 15, Ex. C ¶¶ 2-3; Doc. 27, Ex. 4at 5:1-19.

2. At that time, Aragon did not know that the suspect was Parrish Denison, and did not know anything about why the police were searching for Denison. Aragon only knew that the police were looking for an armed suspect. Doc. 15, Ex. C, ¶ 3; Doc. 27, Ex. 4 at 5:20-24.

3. As he was driving to the scene, Aragon learned that the police department's helicopter, Air One, had located the suspect. Doc. 15, Ex. C ¶ 4; Doc. 27, Ex. 4 at 6:3-12.

4. The events after Aragon arrived on scene took place as follows:

> When I arrived on scene, I got dressed in my Albuquerque Police Department SWAT uniform which contains markings that identify me as a police officer. As I was changing, my sergeant informed me that there was an officer who had access to the roof to the Chili's restaurant that was located near the intersection of Menaul and Lousiana [sic] so he asked me to set up a high ground position from that location.

My primary role as a high ground officer is to observe, provide tactical team members information based upon my observations, and to provide cover for tactical team members who are on the ground.

When I arrived at the Chili's, I met up with Officer Tosta at the front door of the Chili's who opened the locked door and let me inside.

While inside the Chili's I noticed that the restaurant was completely packed with civilians and there were also officers inside the restaurant as well.

I made my way through the kitchen area and down a hallway which I believed connected to other businesses which were in the same building as the Chili's. From there, I found the stairway to the roof of the building.

Once on the roof, I positioned myself on the southeast corner of the building.

From the roof, I looked for the wanted suspect and I also received verification from the Air 1 helicopter unit stating that the suspect was in the next parking lot just east of where I was in front of a four-door pickup truck, hiding amongst some bushes that were just north of the truck.

After receiving the verification of the suspect's location, I tried looking through the optics on my M4 rifle to try to see if I could see the suspect but I was unable to locate him. I then tried looking through the scope of my .308 rifle and I still could not see the suspect so I put on my night vision optics which then allowed me to see the bushes and the vehicle which Air 1 had verified.

Once I was able to locate the bushes and pickup truck, I started looking for any type of movement so that I could identify and locate the suspect.

I didn't see any movement for a while. As I was still looking for movement, I heard a gunshot go off and it was immediately advised the radio [sic] that it was an accidental discharge. I did not notice any movement from the bushes and the pickup truck immediately after the accidental discharge.

As the Air 1 helicopter was orbiting up above, they reported a couple of times that they had seen the suspect laying with his head to the east and his feet to the west in the area of the bushes and the pickup truck.

I did not see any movement from the subject until the entry team started moving west on Menaul in the BearCat armored vehicle. It was at this

3

> point that I saw the top of the bush move and then I saw a head move. When I saw the head move, I saw that the subject had on a baseball cap.
>
> I then observed the subject look east towards the entry team and the BearCat and then tuck back into the bushes. As the entry team moved closer I called out what I had observed.
>
> After the subject tucked back into the bushes, I could not see his face, but I could still see the top of his head.
>
> As the entry team continued to make their way west on Menaul they started to put light on the general area of where the suspect was. The suspect then stood up and moved out from behind the bushes and the vehicle where he had been hiding.
>
> As he got up from hiding behind the bushes and the vehicle, **he moved to the front of the vehicle and it was at this point that I saw that he had a handgun in his right hand. I then fired a round at him . . . . He was still armed with the gun after I fired a round and he began running.** The subject ran onto northbound Chama. I then fired a second round . . . .

Doc. 15, Ex. C ¶¶ 5-21 (emphasis added).

5. The foregoing events took place over the roughly one hour period between 7:06PM (when Aragon was driving to the scene and Denison was located by Air One) and 8:11PM (the time of the shooting). Doc. 27, Ex. 1 at 5; Doc. 15, Ex. C ¶ 4; Doc. 27, Ex. 4 at 6:3-12; Doc. 16, Ex. B1 at 20:11:14-25.

6. A video camera on Air One recorded the shooting. Doc. 16, Ex. B1 at 20:11:14-25.

7. The Air One video shows Denison moving away from the bushes in a fluid movement and eventually running north/northwest on Chama. *Id.*

8. During this period, when Aragon shot Denison, Denison's hands remained in a normal swinging position; he never raised his arms as if to point or shoot his weapon. *Id* at 20:11:14-20.

4

9. No officer gave Denison a command to stop or any other order between the time that Denison left his hiding place and the time that Officer Aragon fired his first and second shots at Denison. Doc. 27, Ex. 4 at 56:10-17.

10. Aragon was never in fear of his own safety. Aragon stated to a police investigator after the incident, "I don't believe I was in any immediate danger, but I feared for the lives of the people that were in the area. I do believe that he could have caused them great bodily harm or death." Doc. 27, Ex. 4 at 14:8-11.

11. Other SWAT team members were providing protection coverage north of Denison's hiding place, and they were armed with a range of weapons including rifles, handguns, beanbag shotguns, tasers, and a police dog. Doc. 27, Ex. 3 at 26:20 – 27:11.

12. The SWAT officers approaching Denison's hiding place on Menaul from the east were in or around an armored vehicle, known as a bearcat, capable of withstanding rounds from a high-powered rifle. Doc. 27, Ex. 7, Information from LencoArmor Website about Bearcat, also available at http://www.lencoarmor.com/law-enforcement/.

13. After getting up from his hiding place, Denison ran north on Chama towards Officer Anthony Sedler (hereinafter, "Sedler") and other SWAT officers, but <u>only after</u> Aragon had fired his first of two shots at Denison. Doc. 16, Ex. B1 at 20:11:19-21.

14. Denison never pointed his gun at an officer between the time he left his hiding place and the time he was shot by Sedler. Doc. 16, Ex. B1 at 20:11:18-25.

15. Sedler and Aragon shot Denison at approximately 8:11 PM. Doc. 16, Ex. B1 at 8:11:25-27.

16. After first being shot by Aragon, Denison never made any threatening movement toward any person. Doc. 16, Ex. B1 at 20:11:19-25.

17. After getting up from his hiding spot Denison never threatened any officer or any person. Doc. 16, Ex. B1 at 20:11:18-19.

18. Sedler fired three rounds at Denison. Doc. 15, Ex. D at 6:30.

19. Aragon fired two rounds at Denison. Doc. 15, Ex. D at 4:23.

20. Denison was shot five times, once in the left chest, once in the left abdomen, once in the right thigh, once in the left thigh, and once in the right lower leg. Doc. 27, Ex. 8 at 2-4.

21. The medical examiner recovered three projectiles from Denison's body with weights of between fifty and fifty-six grains each. Doc. 27, Ex. 8 at 2-4.

22. Sedler shot Denison in the upper left chest, with that projectile traveling through Denison's lung and pericardium, and lodging between his third and fourths ribs in his back. Doc. 27, Ex. 8 at 2.

23. Sedler shot Denison in the upper left abdomen, with that projectile traveling through Denison's abdomen and lodging in the costal cartilage of his eighth rib. Doc. 27, Ex. 8 at 2-3.

24. Sedler shot Denison in the right thigh, with that projectile lodging in Denison's right femur. Doc. 27, Ex. 8 at 3-4.

25. Aragon shot Denison in the left thigh, with that projectile traveling from the back to the front of Denison's thigh, upwards and to the left, and exiting Denison's body. Doc. 27, Ex. 8 at 3.

26. Aragon shot Denison in the right lower leg, with that projectile traveling from the front to the back of Denison's leg, upward and slightly right to left, and exiting Denison's body. Doc. 27, Ex. 8 at 2-3.

27. The weights of the projectiles recovered from Denison's body are consistent with rounds used in Sedler's weapon, but inconsistent with the rounds used on Aragon's weapon. As such, three shots fired by Sedler struck Denison and remained in his body and the other two gunshot wounds to Denison's body were fired by Aragon's high-powered sniper rifle.  Doc. 27, Exs. 8 and 13.

### III.     Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The movant must initially "show that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, rule 56(e) requires that the non-moving party to designate specific facts showing that there is a genuine issue for trial. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). "[T]he nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir. 1993) (quotation marks omitted). It is not enough for the party opposing a motion for summary judgment "rest on mere allegations or denials of his pleadings." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Argo v. Blue Cross & Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1199 (10th Cir. 2006)).

"At the summary judgment state, facts must be viewed in the light most favorable to the nonmoving party *only if there is a 'genuine' dispute as to those facts*." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added). The court may adopt the moving party's version of the facts if the record clearly supports those facts. *See Scott v. Harris[1]*, 550 U.S. 372 (2007) (adopting the moving party's version of the facts where the record blatantly contradicted the non-moving party's version of events); *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009).

### III.     ARGUMENT

Under New Mexico law, "the elements of civil and criminal assault and battery are essentially identical." *Pena v. Greffet*, --- F.Supp.3d ----, 2015 WL 3540060, at *15 (D. N.M. _____) (quoting *State v. Ortega*, 1992-NMCA-003, ¶ 12, 113 N.M. 437). A person is liable for battery if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results." *Id.* (quoting *Restatement (Second) of Torts* § 18(1)(a)-(b)). Civil battery lacks the element of criminal battery that the touching is done in a "rude, insolent or angry manner." *Jonas v. Bd. of Comm'rs of Luna County*, 699 F.Supp.2d 1284, 1297 (D. N.M. 2010) (citing *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1209 n.10 (10th Cir. 2006)

---

[1] When there is a videotape of the incident, the Court must view "the facts in the light depicted by the videotape." *Scott*, 127 S.Ct. 1776. In Scott, there was a videotape of a police chase of a vehicle at night. The United States Supreme Court held that the lower Courts could not rely on a story told by the Plaintiff that contradicted what was seen on the videotape and grant summary judgment to Plaintiff. The Scott Plaintiff told a different story than Defendants and that story contradicted what was seen on the videotape. The Supreme Court held that the lower Courts should not adopt a telling of the story that is "blatantly contradicted by the record." *Id.* Summary judgment should not be denied simply because "there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue of fact for trial. *Matsushita Elec.Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 - 87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted).

(quoting *Ortega*, 1992-NMCA-003, and applying the elements of civil battery from the *Restatement (Second) of Torts*).

"An officer can be held liable for assault and battery if he uses excessive force." *Greffet*, 2015 WL 3540060, at *15 (quotation marks and citation omitted); *Jonas*, 699 F.Supp.2d at 1297 ("An officer in making an arrest is privileged by statute to use only that force which is necessary to restrain the arrested person.") (quoting *State v. Kraul*, 1977-NMCA-032, ¶ 27, 90 N.M. 314). "An officer may use force likely to result in death only in case it appears reasonably necessary to do so to effect an arrest or prevent an escape." *Alaniz v. Funk*, 1961-NMSC-140, ¶ 7, 69 N.M. 164; *see also Jonas*, 699 F.Supp.2d at 1297 (quoting *Realivasquez v. City of Albuquerque,* No. CIV 03-0015 MCA/KBM, Memorandum Opinion and Order at 9, and citing *State v. Gonzales*, 1982-NMCA-043, ¶ 17, 97 N.M. 607) ("A police officer may only use that force that is reasonably necessary to preserve the peace or effect an arrest."). The determination of whether the force used was excessive "must be made in the light of the pressing circumstances as the officer saw them." *Alaniz*, 1961-NMSC-140, ¶ 10.

The analysis to determine whether an officer used excessive force is derived from federal jurisprudence regarding the use of excessive force in violation of the Fourth Amendment. *See State v. Ellis*, 2008-NMSC-032, ¶ 25, 144 N.M. 253 (citing *Graham v. Connor*, 490 U.S. 386 (1989) and *Terry v. Ohio*, 392 U.S. 1, 22-27 (1968)); *Jonas*, 699 F.Supp.2d at 1297 (describing New Mexico's standard for determining excessive force as similar to the test in *Graham v. Connor* in cases predating that decision). According to *Graham* and *Ellis,* the determination about the reasonableness of an officer's use of force "must be judged from the perspective of a reasonable officer on the scene." *Ellis*, 2008-

NMSC-032, ¶ 26 (quoting *Graham*, 490 U.S. at 396). The standard is whether the officers' actions were "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (quoting *Graham*, 490 U.S. at 397). To determine whether an officer's actions were reasonable, the court should consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396). Ultimately, the determination about excessive force must be based on the totality of the circumstances. *Id.* ¶ 41.

Here, Aragon was faced with the following set of circumstances at the time he shot Denison: (1) Denison, as far as Aragon knew, was armed but had not threatened any person; (2) neither Aragon nor any other officer had provided Denison with a warning or other order to stop or surrender; (3) Denison was not close enough to any civilians or other officers to pose an immediate threat; (4) Denison was moving away from his hiding place behind the bush but was not yet running[2]; (5) When Aragon fired his first shot at Dennison he did not know where Dennison was going to run, or in fact, what Dennison was going to do at all[3]; and (6) Denison could not escape because heavily armed and armored police had carefully formed a perimeter around his position.

---

[2] As he got up from hiding behind the bushes and the vehicle, **he moved to the front of the vehicle and it was at this point that I saw that he had a handgun in his right hand. I then fired a round at him . . . . He was still armed with the gun after I fired a round <u>and he began running.</u>** The subject ran onto northbound Chama. I then fired a second round . . .

*Doc. 15*, Ex. C ¶¶ 5-21 (emphasis added).

[3] He did not know for example, whether Dennison would have surrendered but for Aragon's first shot, or whether the shots caused Dennison to fear for his life and start to run.

10

Applying these circumstances to the three *Graham* factors necessarily leads to the conclusion that Aragon's actions were not objectively reasonable and therefore that he used excessive force against Denison. As to the first factor, regarding the severity of the crime Denison was suspected to have committed, Aragon was not aware what, if any, crime Denison had committed. Certainly Aragon had no reason to believe that Denison had committed a serious or dangerous crime. Regarding the third factor, as to Denison's level of resistance to or compliance with arrest, Aragon had no reason to believe that Denison had done anything other than run from police, and no reason to think that Denison had actively resisted arrest in any other way.

As to the third and most important *Graham* factor, the level of threat posed by Denison to other officers and to public safety, the facts known to Aragon at the time he shot Denison were not sufficient for Aragon to believe that Denison posed a risk of harm so serious and immediate that it was necessary for Aragon to shoot him. Aragon admits that he fired not out of any fear for his own safety, but rather out of fear for other people in the area, such as the tactical team which had set up a perimeter securing the area around Dennison. However, the response to Denison's movement undercuts Aragon's concern for their safety. The tactical team officers—who were armed with high-powered rifles, bean bag shotguns, flash-bang grenades, and a police dog—identified themselves as police, shouted commands at Denison, and used a flash-bang grenade, all prior to resorting to deadly force. Given that the tactical team officers felt safe enough to warn Denison prior to shooting, it was not reasonable that Aragon, who was not personally in danger, decided to shoot without warning and for no justifiable and legal reason to do so.

11

**WHEREFORE**, Plaintiff respectfully requests that this Court enter grant summary judgment against Aragon on Plaintiff's assault and battery claims.

        Respectfully submitted,
        LAW OFFICE OF FRANCES CROCKETT

        */s/ Frances Carpenter*
        Frances Carpenter
        Hans Erickson
        925 Luna Circle NW
        Albuquerque, NM 87102
        Phone: (505) 314-8883
        Fax: (505) 835-5658
        *Attorneys for Plaintiff*

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record via the CM/ECF fining system this 24th day of November, 2015.

*/s/ Frances Carpenter*
Frances Carpenter